VERNON MERCIER, derivatively on )
behalf of MASSEY ENERGY COMPANY, )
)
        Plaintiffs, )
)
    v. )
)
DON L. BLANKENSHIP, BAXTER )
PHILLIPS, JR., DAN MOORE, E. )
GORDON GEE, RICHARD M GABRYS, )   **Case No.**   2:07-0555
JAMES CRAWFORD, BOBBY R. )
INMAN, ROBERT H. FOGLESONG, H. )
DREXEL SHORT, JR., J. CHRISTOPHER )
ADKINS and JEFFREY M. JAROSINSKI )
)
        Defendants. )
)
    and )
)
MASSEY ENERGY COMPANY, a )
Delaware Corporation )
)
        Nominal Defendant. )

## SHAREHOLDER DERIVATIVE COMPLAINT

### NATURE AND SUMMARY OF THE ACTION

1.     This is a shareholders' derivative action brought on behalf of nominal defendant Massey Energy Company ("Massey Energy" or the "Company") against certain members of its Board of Directors (the "Board") and certain of its executive officers seeking to remedy breaches of fiduciary duties and other misconduct.

2.     As alleged in detail herein, from 2000 to the present (the "Relevant Period"), the Individual Defendants (as defined herein) engaged in a scheme and wrongful course of business whereby the Individual Defendants disregarded their obligations by failing to ensure Company

compliance with legal obligations and failing to remain informed as to the Company's internal controls, failing to make reasonable inquiries in connection with it notice of unsound conditions or practices, to make reasonable inquiry in connection therewith, and failing to take steps to correct such conditions or practices.

## JURISDICTION AND VENUE

3.      This court has subject matter jurisdiction pursuant to 28 U.S.C. §1332 (Diversity Jurisdiction) because the amount in controversy exceeds $75,000.00 exclusive of interest and costs, and because this is an action by an individual and representative plaintiff who is a citizen of a different state from the defendants.

4.      Venue is proper in this district pursuant to 28 U.S.C. §1391(a) and (c).  A substantial part of the events or omissions giving rise to the claim occurred in this District.

## PARTIES

5.      Plaintiff Vernon Mercier is, and was at all times relevant hereto, an owner and holder of Massey Energy common stock.

6.      Nominal defendant Massey Energy is a corporation organized and existing under the laws of Delaware with its principal executive offices located at 4 North 4th Street, Richmond, Virginia.  According to the Company's public filings, Massey Energy is the fourth largest coal producer by revenue in the United States.

7.      Defendant Don L. Blankenship ("Blankenship") has served as a director of Massey Energy since 1996 and as the Company's Chief Executive Officer and Chairman of the Board since November 30, 2000 and as Chairman of the Board, Chief Executive Officer and President of affiliate A.T. Massey Coal Company, Inc. ("A.T. Massey") since 1992. Blankenship currently resides in Sprigg, West Virginia.

8.      Defendant Baxter Phillips, Jr. ("Phillips") has served as a director of the Company since 2007. Phillips has also served as the Company's Executive Vice President and Chief Administrative Officer since November 2004. Phillips also served as the Company's Senior Vice President and Chief Financial Officer from September 2003 to November 2004, and as Vice President and Treasurer from October 2000 to August 2003. Phillips joined the Company in 1981 and has also served in the roles of Corporate Treasurer, Manager of Export Sales and Corporate Human Resources Manager. Phillips currently resides in Manakin Sabot, Virginia.

9.      Defendant Daniel R. Moore ("Moore") has served as a director of the Company since January 22, 2002. Moore is the Chairman of the Audit Committee and a member of the Governance and Nominating Committee and the Safety, Environmental and Public Policy Committee ("SEPPC"). Moore is also the Chairman of Moore Group, Inc., which owns multiple automobile dealerships in Williamson, West Virginia, since 1999. Moore currently resides in Charleston, West Virginia.

10.     Defendant E. Gordon Gee ("Gee") has served as a director of the Company since November 30, 2000. Gordon is Chairman of the SEPPC and is a member of the Audit, Executive, and Governance and Nominating Committees. Gee currently resides in Monteagle, Tennessee.

11.     Defendant James Crawford ("Crawford") has served as a director of the Company since February 7, 2005. He is a member of the SEPPC, as well as the Audit and Governance and Nominating Committees. Crawford currently resides in Richmond, Virginia.

12.     Defendant Bobby R. Inman ("Inman") has served as a director of the Company since 1985. Inman is Chairman of the Compensation Committee and a member of the Executive and Governance and Nominating Committees. Inman currently resides in Austin, Texas.

3

13.     Defendant Robert H. Foglesong ("Foglesong") has served as a director of the Company since February 21, 2006. Foglesong is a member of the SEPPC as well as the Governance and Nominating Committee. Foglesong currently resides Starkville, Mississippi.

14.     Defendant H. Drexel Short ("Short") served as the Company's Senior Vice President of Group Operations from 1995 to July 12, 2007. Short was formerly Chairman of the Board and Chief Coordinating Officer of Massey Coal Services from 1991 to 1995. Short joined the Company in 1981. Short currently resides in Charleston, West Virginia.

15.     Defendant John C. Adkins ("Adkins") has served as the Company's Senior Vice President and Chief Operating Officer since July 2003. Adkins joined Rawl Sales & Processing Co., a subsidiary of Massey Energy in 1985. Since that time, he has served as section foreman, plant supervisor, President of the Company's Eagle Energy subsidiary, Director of Production of Massey Coal Services, Inc. and, most recently, Vice President of Underground Production. Adkins currently resides in Danville, West Virginia.

16.     Defendant Jeffrey M. Jarosinski ("Jarosinski") has served as the Company's Vice President of Finance since 1998 and Chief Compliance Officer since December 2002. From 1998 through December 2002, Jarosinski served as the Company's Chief Financial Officer. Jarosinski joined the Company in 1988. Jarosinski currently resides in Powhatan, Virginia.

17.     Collectively, Defendants Blankenship, Phillips, Moore, Gee, Crawford, Inman and Foglesong are referred to herein as the "Director Defendants."

18.     Collectively, Defendants Blankenship, Phillips, Moore, Gee, Crawford, Inman, Foglesong, Short, Adkins, Jarosinski are referred to herein as the "Individual Defendants.

4

## DUTIES OF THE INDIVIDUAL DEFENDANTS

19.     By reason of their positions as officers and/or directors of Massey Energy and because of their ability to control the business and corporate affairs of Massey Energy, the Individual Defendants owed Massey Energy and its shareholders fiduciary obligations of good faith, loyalty and due care, and were and are required to use their utmost ability to control and manage Massey Energy in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Massey Energy and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to Massey Energy and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

20.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Massey Energy, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

21.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Massey Energy, and was at all times acting within the course and scope of such agency.

22.     To discharge their duties, the officers and directors of Massey Energy were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Massey Energy were required to, among other things:

(a) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;

(b) remain informed as to how Massey Energy conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state laws, government rules and regulations and the charter and bylaws of Massey Energy;

(c) ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations;

(d) remain informed as to the status of Massey Energy's operations, including its practices in relation to environmental compliance and employee safety and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps necessary to correct such conditions or practices;

(e) refrain from wasting the Company's assets or unduly benefiting themselves at the expense of the Company;

(f) maintain and implement an adequate system of internal controls over all aspects of Massey Energy's business and administration;

(g) act in furtherance of the best interests of Massey Energy and its shareholders, and not in furtherance of their own personal interests; and

(h) preserve and enhance Massey Energy's reputation and maintain public trust and confidence in Massey Energy as a prudently managed institution fully capable of meeting its duties and obligations.

23.    According to the Company's most recent Proxy Statement, the SEPPC's[1]

responsibilities and duties included:

---

[1] The SEPPC was formerly known as the Public and Environmental Policy Committee. The Public and Environmental Policy Committee was renamed the SEPPC in or around February 2006. According to the Company's prior Proxy Statements, the principal duties of the Public and Environmental Policy Committee were to: (a) review and make recommendations regarding the policies, programs, position and strategies of the Company in relation to public and environmental issues deemed significant by the Committee or which may be referred to the Committee by the Board or by management; (b) review and make recommendations regarding political, social and

(a)  to review and make recommendations regarding the policies, programs, positions and strategies of Massey Energy in relation to safety, environmental and public policy issues deemed significant by the Committee or which may be referred to the Committee by the Board or by management;

(b)  to review and make recommendations regarding safety, environmental, political, and social trends and issues as they may affect the operations of the Company and its subsidiaries;

(c)  to review and make recommendations in respect of the Company's general policies regarding support of business, charitable, educational and political organizations;

(d)  to review and make recommendations in respect of the Company's safety, environmental and public policies and practices, and

(e)  to review the adequacy of this Charter and recommend any changes to the Board.

24.     In addition, certain of the Director Defendants assumed heightened obligations through their participation on the Executive Committee. According to the Company's most recent Proxy Statement, "[t]he Executive Committee exercises all of the power and authority of the Board of Directors in the management of our business and affairs to the extent permitted by Delaware law and the Executive Committee charter."

25.     As alleged in detail herein, the Individual Defendants completely abdicated their fiduciary duties and instead allowed Blankenship and other Massey Energy officers to engage in illegal and imprudent conduct at the expense of the Company.

---

environmental trends and issues as they may affect the operations of the Company and its subsidiaries; (c) review and make recommendations in respect of the Company's general policy regarding support of business, charitable, educational and political organizations; and (d) review and make recommendations in respect of the Company's environmental policies and practices.

26. The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

27. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Massey Energy.

28. Further, the misconduct of Massey Energy's officers has been approved by the Board, which has failed to take any legal action on behalf of the Company against them.

## THE INDIVIDUAL DEFENDANTS PERMITTED MASSEY ENERGY TO VIOLATE ENVIRONMENTAL AND WORKER-SAFETY LAWS

29. From 2000 to the present, the Individual Defendants consciously refused to exercise their fiduciary duties to oversee the affairs of the Company and its subsidiaries. During the Relevant Period, the Individual Defendants permitted Massey Energy and its subsidiaries to engage in an ongoing pattern of environmental-protection and worker-safety misconduct. The Individual Defendants' continuing, willful and knowing breaches of their fiduciary duties, despite repeated civil and criminal enforcement efforts by private, state, federal and non-governmental interests, threatens the continued viability of the Company's present operation and its ultimate profitability.

### Environmental Protection Agency ("EPA") Complaint

30. On May 10, 2007, the EPA filed suit against Massey Energy, A.T. Massey and the Company's subsidiaries in West Virginia and Kentucky, alleging systematic and continuing violations of the Clean Water Act of 1977 ("CWA") and Water Quality Act of 1987 (the "EPA Complaint"). The EPA Complaint demands payment of civil penalties estimated to be as much as $2 billion.

31.     The EPA Complaint alleges as follows:

>   Massey Energy and the subsidiaries named herein ... have an extensive
>   history of violating the Clean Water Act, and despite several prior
>   enforcement actions, including two criminal plea agreements, settlement
>   of suspension and debarment matters, civil actions by the state of West
>   Virginia and the Commonwealth of Kentucky, and private suits by citizens
>   in West Virginia and Kentucky, Massey Energy and its subsidiaries
>   continue to violate the CWA.

32.     The EPA Complaint states that Massey Energy and its subsidiaries continue to

violate the CWA, alleging that the Discharge Monitor Reports ("DMRs") submitted by Massey

Energy subsidiaries "from April through December of 2006 document approximately 8,537 days

of [National Pollutant Discharge Elimination System ("NPDES")] permit limit violations (276

exceedances of the average monthly permit limits and 257 exceedances of the daily maximum

limits)."

33.     State inspectors took samples at the Company's facilities in West Virginia from

April through December 2006, which demonstrated an additional 147 violations of NPDES

permit effluent limitations.  Moreover, the West Virginia inspectors issued notices of violations

("NOVs") pursuant to the West Virginia Surface Coal Mining and Reclamation Act

("WVSCMRA") for "21 additional violations of NPDES permit conditions or unpermitted

discharges into the waters of the United States."

34.     The EPA is also seeking an assessment of civil penalties against Massey Energy

for the continuing violations and earlier documents violations from January 2000 through March

of 2006, for which Massey Energy subsidiaries' DMRs demonstrate that the subsidiaries violated

the CWA "approximately 4,100 times, resulting in approximately 60,534 days of violation."

35.     The EPA Complaint further alleges that independent samples taken by state

inspectors demonstrate "534 exeedances of permit limits by Massey Energy subsidiaries" and

that "Massey Energy subsidiaries received approximately 1,943 [NOVs] under [WVSCMRA] from January of 2000 through March of 2006" and that "[a]t least 255 of these NOVs show violations of the CWA, including 221 that document additional NPDES permit limit violations."

36. The EPA Complaint summarizes Massey Energy's and its subsidiaries' "long history of noncompliance with CWA." For example, the EPA Complaint states that Martin County Coal Corporation, a Massey Energy subsidiary, was responsible for one of the largest coal slurry spills in United States history in October 2000.

37. Additionally, in December 2002, Omar Mining Company and Independence Coal Company, pled guilty to violating the CWA. The subsidiaries were sentenced to five years probation and fines totaling $200,000. Prior to the entry of the two guilty pleas, Massey Energy, Independence Coal Company, and Omar Mining Company entered into an agreement with the EPA Suspension and Debarment Division that "recited several other major violations by Massey Energy subsidiaries between 2000 and 2002" and "mandated implementation of a company-wide environmental compliance program, training, independent environmental audits, adequate funding and staffing for environmental compliance, additional reporting requirements of discharges to surface waters, and other conditions."

38. According to the EPA Complaint, the major violations included the following:

(1) an October 2000 spill from a Martin County Coal Corporation facility;

(2) an August 2001 spill of coal slurry from a Bandmill Coal Corporation facility into Rum Creek following a break in a line associated with a slurry injection point;

(3) an April 2002 coal slurry spill into the Tug Fork of Big Sandy River following a break in a coal slurry line at a Long Form Coal Company facility;

(4) erosion of a valley fill at a Bandmill Coal Corporation facility that resulted in flow of mud and water which damaged the property of numerous private individuals;

(5) a July 2002 spill at an Alex Energy, Inc. facility due to an opening in a berm; and

(6) an October 2002 coal slurry spill into Dehue Creek from a Bandmill Coal Corporation facility.

39.    According to the EPA Complaint, in April of 2006, the West Virginia Department of Environmental Protection ("WVDEP") settled lawsuits filed against Independence Coal Company, Omar Mining Company, Marfork Coal Company, and Bandmill Coal Corporation for numerous discharges of pollutants into state waters in violation of the West Virginia Water Pollution Control Act through November 30, 2005. "[S]ince November 30, 2005, the four subsidiaries included in the April 2006 settlement have continued to discharge pollutants into waters of the United States in violation of Section 301 and 402 of the CWA ... as reflected in certified DMRs and numerous NOVs."

40.    The EPA Complaint argues that "[d]espite this history of CWA violations and enforcement efforts by federal, state, and local authorities, Massey Energy and its subsidiaries continue to violate the CWA, and remain in substantial noncompliance with the law."

**Environmental Organizations Intervene in the EPA Litigation**

41.    In a suit filed September 22, 2005, with this Court, Coal River Mountain Watch, Ohio Valley Environmental Coalition, and West Virginia Highland Conservancy organizations contested the U.S. Army Corps of Engineers' ("Corps") authority to grant permits to Massey Energy subsidiaries involved in mountaintop-removal mining practices.

42.     On March 27, 2007, the Court ruled in favor of the environmental organizations and rescinded four mining permits the Corps issued to Massey Energy. The court later partially stayed its ruling, which permitted mining to resume in fills already under construction.

43.     On June 19, 2007, these environmental organizations, moved to intervene in the EPA's lawsuit against Massey Energy, which the United States does not oppose.

**Blankenship Ignores Miner Safety and Emphasizes Coal Production**

44.     The Individual Defendants' willful disregard for ensuring the Company's compliance with health and safety continues to the present, creating a consistent pattern of violations that have had costly results for the Company. The Director Defendants consciously caused the Company to act in a callous irresponsible culture.

45.     During the Relevant Period, Massey Energy operations were cited on numerous occasions for violating core worker safety laws:

(a)     Massey Energy had to pay $2.5 million after a jury in a wrongful-discharge lawsuit found that Massey Energy wrongfully fired former employee James Stafford for reporting safety violations at Massey Energy's mines.

(b)     The U.S. Department of Labor-Mines Safety and Health Administration ("MSHA") cited Massey Energy's Martin County, Kentucky facility with two "unwarrantable failure" and "high negligence" violations of federal mine safety standards contributing to a massive coal slurry spill in Kentucky in October 2000. Although no workers were injured, many were put at risk when the Company failed to accurately report heavy erosion under a 72-acre pond located above one of its mines and failed to seal the pond as promised after an earlier failure.

(c) Massey Energy was cited with four violations of federal mine safety rules following a MSHA investigation prompted by the February 2001 death of a miner at Massey Energy's Marfork subsidiary. The report concluded that Massey Energy had not provided workers with proper mining equipment or safety gear.

## Blankenship's October 19, 2005 Memorandum (the "October 2005 Memo")

46. In the October 2005 Memo, Blankenship directed to all deep-mine superintendents and Short and Adkins the following:

> SUBJECT: RUNNING COAL
>
> If any of you have been asked by your group presidents, your supervisors, engineers or anyone else to do anything other than run coal (i.e. – build overcasts, do construction projects, or whatever), you need to ignore them and run coal. This memo is necessary because we seem not to understand that the coal pays the bills.

## Wrongful Termination of Rocky Allen Burns for Reporting Violations to MSHA

47. A Boone County Circuit Court jury has recently concluded that just two weeks before the October 2005 Memo, Massey Energy subsidiary Independence Coal wrongfully discharged Rocky Allen Burns, its in-house safety inspector, for reporting violations of mandatory health and safety regulations to MSHA. The jury found that Independence Coal should pay $1 million in punitive damages as a result of its wrongful conduct.

48. The jury awarded nearly $2 million in damages to Rocky Allan Burns, a former in-house safety inspector at Massey Energy subsidiary, Independence Coal Co.'s Just No. 1 mine near Uneeda.

49. Mr. Burns alleged that Independence Coal fired him in October 2005 after he reported safety violations at the mine to MSHA. Some of the problems included unsafe man-trips, which transport workers in and out of the mine. The jury awarded Mr. Burns $899,554 in

lost wages and $100,000 for "aggravation, inconvenience, humiliation, embarrassment and loss of dignity," according to the jury verdict form. Mr. Burns was also awarded $1 million in punitive damages.

## Tragedy at the Aracoma Alma #1 Mine

50.     Just three months after the wrongful discharge at of Mr. Burns and the October 2005 Memo, a fire at the Aracoma Alma #1 mine claimed the lives of two miners, Don Bragg and Ellery Hatfield.

51.     The miners' widows asserted that a prime example of the Massey Energy Defendants' wrongful acts is the October 2005 Memo, which ordered the mine superintendent at the Alma Mine to "ignore" any instructions that had "to do anything other than run coal," which included any safety projects. The widows argued the October 2005 Memo, "as powerful as it is, appears to be only the tip of the iceberg, giving a mere glimpse of the extent to which the Massey Energy Defendants interfered with the daily concerns of its member mines, constantly demanding high production at any and all costs, including the safety of its miner."

52.     The widows further allege that Blankenship personally directed management "to prioritize coal production over all else, to the exclusion of state and federal mine safety laws, among other acts and policies by Mr. Blankenship which created the hostile attitude towards safety and the resulting deadly conditions in the Alma Mine on January 19, 2006."

53.     As a corporate officer, Mr. Blankenship is held to the same standard of care as the corporation itself, and when he commandeered the affairs of the Aracoma Alma Mine No. 1 in his official roles with the Massey Energy Defendants, he assumed the same duties to the miners as though he were the mine operator and employer.

54.     Blankenship's October 2005 Memo, his personal involvement in the management

of Company subsidiaries, and his implementation of a management system that prioritizes

production over worker safety have afforded the widows an opportunity to sue Blankenship

directly, and thereby, sue the Company and A.T. Massey under the theory of *respondeat*

*superior*, despite the fact that Aracoma is a separate legal entity wholly owned by A.T. Massey –

which in turn is a wholly owned subsidiary of the Company.

55.     The widows explained in their court filings how evidence demonstrates that

Blankenship's personal actions on behalf of the Company and A.T. Massey are sufficient to hold

each of them liable for the deaths of the miners.  The document contains extensive witness

statements that explain Blankenship's October 2005 Memo reflects a deeply rooted corporate

culture that prioritized production over safety, how this corporate culture was instilled and

maintained by Blankenship and other top management of the Company, how compensation

incentives and exacting production reports from subsidiaries to the Company every two hours

contributed to the corporate culture, and how that corporate culture cause the deaths of the two

miners because the subsidiary's management "actively engaged in bypassing safety mechanisms

in order to keep up production."

56.     As an example of the effect of such a culture, the widow's submission to the court

quotes an interview with Larry E. Browning, a headgate operator at the Alma mine as follows:

> A.     And outside, you know, they want you to run coal, you know.
>
> ***
>
> Q.     As a miner, and I know you don't have a lot of experience in the mines,
>
>         but do you have any suggestions or maybe thoughts on why they don't
>
>         have air there on that longwall?

A.    Yeah, in a hurry to run coal. Just basically, they want you to hurry up and run it.

Q.    So, it's more production oriented, you thing?

A.    Yeah. It's like a fast-food restaurant to me, you know, hurry up and get it up, hurry up and get it up.

Q.    Do you feel in jeopardy in any way that if you were to complain to your boss that you didn't have adequate ventilation, that you would stand to --

A.    Oh, yeah.

Q.    -- be reprimanded or something?

A.    Nobody -- the whole mine I thing is like that, you know. Nobody says hardly anything. I mean, I ain't saying they would just up and fire you, but they wouldn't my opinion, they wouldn't listen to you. And if you did really push the issue, you'd probably head out the door, I'd say.

57.    During the investigation of the death of the miners, other Massey Energy employees expressed similar concerns that support the widows' description of a Massey Energy corporate culture. Those statements are quoted extensively in documents filed in the civil litigation over the miners' death.

58.    The recent verdict against Massey Energy's subsidiary for wrongful discharge of Rocky Allen Burns on October 6, 2005 supports the widows' allegations.

59.    The widows of the miners are just the latest complainants against the Company and its subsidiaries. In connection with the January 19, 2006, Aracoma fire, MSHA, on March 29, 2007, levied the largest fine ($1.5 million) ever assessed for a coal mining incident against the Company's subsidiary. This fine flows from MSHA's announcing the report and the fine,

16

Richard Stickler, Assistant U.S. Secretary of Labor for Mine Safety and Health, stated that "[t]he number and severity of safety violations at the mine at the time of the fire demonstrated reckless disregard for safety, warranting the highest fine MSHA has levied for a fatal coal mining accident."

60.     The MSHA final report was a product of an investigation that lasted over one year and, according to MSHA, was hindered by an uncooperative (and obstructive) Massey Energy subsidiary. Because of the Massey Energy subsidiarie's failure to provide information and physical evidence requested by the investigators, despite numerous requests amid pleas that the requested information and physical evidence was needed "to determine the root cause(s) of the fire to help prevent similar accidents from occurring in the future," for the first time in the history of the agency, MSHA was forced to sue the mine operator in June 2006. As MSHA's acting administrator David Dye explained, the lawsuit represented "the first time MSHA has been faced with a broad refusal by a mine operator to provide relevant documents in an investigation and, subsequently, the first time that this kind of civil action against a mine operator has been necessary."

61.     Soon after MSHA sued the Massey Energy subsidiary, the West Virginia Office of Miner's Health, Safety and Training ("WVOMHST") completed its investigation of the Aracoma fire and reported that 168 notices of violations were issued against the Massey Energy subsidiary; seven of those violations contributed to the miners' deaths according to the report.

62.     In November 2006, J. Davitt McAteer issued a preliminary report (the "McAteer Report") to West Virginia's Governor regarding the tragedy, in which the former assistant secretary of the United States Department of Labor reported that the Massey Energy subsidiary

failed to take well-known steps to prevent a well-recognized risk of fire associated with coal conveyer belts:

> The responsibility for preventing conditions that have the potential to develop into mine fires rests with the coal mine operator under both West Virginia and federal law. Conditions existed which caused the fire to burn, creating dangerous smoke and heat which resulted in the deaths of two men and the endangerment of others. These conditions should have been detected and steps taken to remove the risks, but they were not. This fire was preventable, but it was not prevented.

63. The McAteer Report also distinguished the Alma Tragedy from the Sago mine disaster that had occurred just two weeks prior. "While the Sago explosion may have been triggered by a force of nature ... evidence suggests the Alma fire erupted at the lethal intersection of human error and negligent mining practices."

64. The McAteer Report also finds significance in Blankenship's October 2005 Memo, quoting it verbatim and giving the Aracoma Alma #1 outby foreman's interpretation of its message: "it sounds as if they don't want you to shut production down to go build an overcast or construction jobs." The McAteer Report explains in its previous section how the failure to devote time and attention to mandatory safety measures caused the tragedy.

65. A federal criminal investigation into the Aracoma fire also has been ongoing since April 2006. The Charleston Gazette reported in March of this year, that "[t]wo Massey Energy foremen are targets of a criminal investigation into the January 2006 fire that killed two workers at Massey's Aracoma Alma No. 1 Mine." The same article noted that "State Mine Safety Director Ronald Wooten is seeking to revoke or suspend the licenses of seven Massey foremen for their roles in the fire that killed miners Don Bragg and Ellery Hatfield."

**Massey Energy's Damages**

66.     The effect of the corporate culture emphasizing production over safety has also caused the Company to suffer harm from an ongoing labor shortage.  An August 1, 2006 Morningstar analyst report explains how labor shortages "have caused Massey Energy to pay more for new hires" and that "productivity will suffer as they are being trained." The labor shortage is caused in no small part by the corporate culture that values production over safety as can be seen by the reasons given for resignations following the tragic fire.  As Alma beltman Brandon Conley told officials investigating the fire, "I just don't feel safe there anymore." Shuttle car operator Gary Baisden summed up his reasons for leaving Alma for the surface mine position: "The sky won't fall on me."  The Company's latest annual report echoes Morningstar's concerns about labor costs for its West Virginia operations.

67.     Massey Energy's corporate culture also increased costs for the Company by causing state and federal legislatures to pass new safety regulations that are costly to implement. According to the Morningstar analyst, these regulations translate into increased costs for the Company's underground mining operations.  These costs are shown in the Company's latest annual report, where it is also noted that the Aracoma Alma #1 Mine fire contributed to six months' lost production for the Company.  Based on the confluence of the increased labor costs, increased costs from heightened safety standards, and the production lost because of repairs and inspections associated with the Aracoma fire, Morningstar reduced its fair value estimate from $43 per share to $29 per share, a 32% decrease.  This is part of the "Blankenship Discount" in share value alluded to by Loeb and Swanson, the two directors who recently resigned from the Company's Board, in their resignation letter. As explained further herein, the Company has acknowledged the significant effect of the factors referenced by the Morningstar analyst.

19

68.     Not surprisingly, Massey Energy subsidiaries' safety violations persist, and calls

for increased regulation of the mining industry continue.  On June 15, 2007, MSHA sent letters

to two Massey Energy subsidiaries alleging that the operators had committed a potential pattern

of safety violations – one has been cited for 80 violations and the other 250 violations –since

January 2005.  According to MSHA, these letters are indicative of the agency's increased

emphasis on worker safety, which was demanded by the public and their representatives, in part,

because of the Aracoma Alma #1 tragedy.

69.     Defendants have breached their fiduciary duties by permitting the worker-safety

violations to occur and by allowing a corporate culture of malfeasance to become endemic in the

Company and among its subsidiaries.

**Shareholders Express Concerns Regarding the Company's Management**

70.     On September 19, 2005, Third Point LLC ("Third Point"), an investment

company managed by Loeb, filed a Form 13D with the SEC disclosing that the fund had

purchased 5.9% of Massey Energy common stock on the open market.  In its filing with the SEC,

Third Point included a letter addressed to Defendant Blankenship, charging that Massey Energy

was poorly managed, and that as a result, the returns to shareholders' were depressed.  Third

Point also called for Blankenship to be removed as CEO, citing a "Blankenship Discount"

factored into the stock price:

> Such a discount may be attributable to the Company's many
> operating glitches, disappointments in earnings and recent failure
> to hedge its diesel costs .... Accordingly, we demand that any free
> cash flow be returned to shareholders via a share repurchase....
> Should you and the Board remain like deer frozen in the
> headlights, I am certain that, with the constitution of the
> Company's shareholder base, we could rally support for new
> leadership to manage the company and its capital structure more
> effectively.

71.    Massey Energy appeared to partially capitulate to shareholder demands on

November 15, 2005, when the Company announced that it would repurchase up to $500 million

of its stock beginning in the second half of 2006.  However, in January 2006, the Company

announced that it had lowered its expectations for coal shipments to reflect the fire at the

Aracoma mine.  On February 28, 2006, Massey Energy revealed to investors that the Company's

Q1 2006 financial performance would not meet investor and analyst expectations due, not only

to the January fire at Aracoma, but also to weak longwall mining performance and Massey

Energy's inability to hire and retain experienced labor.

72.    In March 2006 (in response to the Company's recent announcements), Third Point

initiated a proxy contest.  On March 15, 2006, Third Point sent Massey Energy a notice (filed

with the SEC on Form SC 13(d)A on March 16, 2006) that it intended to nominate two directors,

Loeb and Swanson, at the Company's 2006 Annual Meeting to be held on May 16, 2006.  The

Form 13(d) filed by Third Point stated as follows:

> Third Points Offshore delivered its nominee notification because
> the Reporting Persons believe that the Company has not performed
> well and has lost sight of the concerns and interests of stockholders
> generally.  The Reporting Persons believe that the Company's
> board of directors (the "Board") should include representatives of
> significant stockholders who can present stockholders'
> perspectives on management direction, champion reform of
> compensation, perquisites and managed incentives, and generally
> bring focus to the maximization of value for the benefit of
> stockholders.  If elected to the Board, the Nominees will seek to
> accelerate execution of the Company's stock buyback program.

73.    On March 20, 2006, Massey Energy purported to offer a response to Third Point's

contention in a DEFA14A filed with the SEC, in which the Company again blamed the Aracoma

fire and labor issues for the Company's weak short-term performance:

> "Massey Energy as an independent and highly experienced board
> of directors who remain confident that our business strategy will
> continue to build long-term value for all of our shareholders," said
> Don L. Blankenship, Massey Energy Chairman and CEO. "While
> our short-term results have been negatively impacted by the
> Aracoma fire and the ongoing lack of experienced, available labor,
> management expects improved productivity and margin expansion
> later in 2006 and in future years."

74.     With the Individual Defendants "digging in their heels" to protect Blankenship

and the Company's own director nominees in advance of the May 2006 annual meeting, Third

Point filed an amended proxy statement with the SEC on March 20, 2006. The proxy statement

set forth Third Point's reasoning behind launching a proxy contest and how the dissident slate of

directors planned to increase Massey Energy shareholder value:

> Among the proposals that the Third Point Nominees expect to
> make are proposals to (i) accelerate and possibly expand the
> Company's share repurchase program; (ii) review the personal use
> by management of private aircraft, company housing and company
> cares; (iii) review the Company's need to own or lease private
> aircraft; and (iv) more closely tie management compensation to the
> Company's operating results.   In regards to the last of these
> potential proposals, the Third Point Nominees believe, particularly
> in light of the fact that Company guidance as to the level of
> produced coal shipments has been revised downward three times in
> a recent span of less than six months, that it is necessary to hold
> management accountable for operational shortcomings.

75.     On April 24, 2006, Third Point filed another amended proxy statement on Form

DEFA14A soliciting shareholder support for its slate of directors. This filing provided greater

detail regarding the obvious shortcomings in Blankenship's (and the other Individual

Defendants') stewardship of the Company:

> *History of Poor Management Guidance and Weak Stock Performance*
>
> We have become increasingly concerned with Massey Energy's
> decreasing projected production levels and management's inability
> to make accurate forecasts. The Company operates in an industry
> that is benefiting from increasing market demand and strong

22

pricing, particularly in the Central Appalachia dynamics has not helped stockholders.

Management recently lowered guidance three times in less than six months. The second of these unwelcome surprises came on January 26th, following the tragic fire at the Aracoma Alma mine, when management reduced expected shipments "to conservatively reflect the impact" of the fire on production. Yet only one month later, on February 28, management warned that first quarter performance was "far below" expectations "primarily due to the Aracoma fire, weak longwall performance and a shortfall in production form other underground mines, which continue to suffer from lack of experienced, available labor."

. . .

### Extravagant Compensation for Massey Energy's CEO

In the past three years, the Company has lavished compensation on its Chief Executive Officer, paying him a multiple of the CEO compensation paid by four publicly traded competitors – Peabody Energy Corporation, CONSOL Energy Inc., Arch Coal, Inc. and Foundation Coal Holdings, Inc.

For the year ended December 31, 2005, Massey Energy's CEO was paid $33.7 million, more than four times the average compensation of $8.1 million for the competitors' CEOs.

For the three years ended December 31, 2005, Massey Energy's CEO received an average of $15.6 million per year, as compared with an average of $5.3 million per year paid to the competitors' CEOs.

In 2004 and 2005, Massey Energy paid to its CEO 40.9% and 52.1%, respectively, of the entire "Adjusted Net Income" reported by the Company for those years.

### Stockholder-Friendly Initiatives Under Pressure

In its efforts to convince you not to elect the Third Point Nominees, management has touted its "demonstrated responsiveness to shareholder concerns." From where we sit, much of management's "responsiveness" has been reactive rather that proactive.

. . .

*Corporate Governance Issues*

Even in a larger corporation, sometimes it's the small things that set the tone. If elected to Massey Energy's Board of Directors, the Third Point Nominees intend to take a close look at management perquisites and related-party transactions, including the following:

## Massey Energy's Air Force

The Company maintains among its fleet of aircraft a multi-million dollar Challenger 601 jet, with a range of some 3,000 miles that in the past year has been flown to Nassau, Bahamas; Las Vegas, Nevada; Scottsdale, Arizona; Bar Harbor, Maine; and numerous locations in Florida and California, including West Palm Beach, Naples, Los Angeles, San Diego and San Francisco. We find it troubling that Massey Energy maintains this luxury jet when a majority of its business is in Central Appalachia (an area extending no more than 500 miles), and our concern is heightened by Company disclosures indicating that Company aircraft are available, at Company expense, for the personal use of the CEO. If elected to the Board of Directors, we will urge the Board to get rid of the Challenger 601 luxury jet and review the use of the other aircraft. We think a good place to put the cost savings from the luxury jet would be a program to reward and retain the Company's miners.

## Dealings with Relatives

Massey Energy purchases more that $1 million per year of automobile and light truck parts from A-A Tire and Parts, Inc. ("A-A"), a company owned by a nephew of the Company's CEO. While not disclosed in the Company's proxy statement, we understand that another relative of the CEO is an officer of A-A and that as many as five relatives of the CEO work for A-A. We believe that transactions such as these should be expressly approved by the Board's audit committee. The Company should promptly disclose to stockholders not only a detailed explanation of the reasons for any such approval, but also meaningful facts that indicate the significance of the Company's relationship to the executive's relative or his business. In the case of A-A, we believe that the Company should disclose what percentage of its revenues the Company's $1 million of expenditures represented.

## CEO Housing

Massey Energy's CEO is provided a Company-owned home to live in. In fact, after he leaves the Company, the house is to be given to

him as a parting gift. No one else at the Company gets free housing, much less an entire home as a retirement gift. What kind of example does it set when a CEO who makes $33.7 million in a single year is given free housing while the Company is having difficulty retaining its mine workers?

Management's Scare Tactics

Management warns against electing us to the Company's Board because, they claim, "a change in the composition of the board or management at this time would be disruptive of the Company's efforts to create and maintain long-term value."

We find this claim to be an obvious effort to scare you into voting for management's slate, and we urge you to reject this cynical tactic.

76.     At the annual meeting on May 16, 2006, shareholders cast their votes in support of the Third Point director nominees, sending a clear message to Massey Energy's Board and management that they were unhappy with the status quo and the manner in which Defendant Blankenship had controlled and directed the Company's operations and efforts. On June 28, 2006, the Third Point Directors, Loeb and Swanson, began serving on Massey Energy's Board.

77.     However, just days later, on June 30, 2006, Defendant Blankenship caused Massey Energy to (a) amend its by-laws to expand the size of the Board, and (b) appoint Defendant Crawford, the former CEO of James River Coal Company, as a director.

78.     By expanding the size of the Board, Massey Energy effectively diluted the impact of outside shareholder representation on the Board. Massey Energy's action had the desired effect of thwarting substantive reform as the Third Point directors resigned after serving on the Board for less than one year.

79.     On June 13, 2007, Loeb and Swanson resigned from Massey Energy's Board and very publicly stated their concerns about Massey Energy's management generally and

Blankenship's leadership specifically. A resignation letter signed by Loeb and Swanson (and filed with the SEC on June 14, 2007) stated in part:

> We believe that the sale of substantially all forward production, without locking in costs, reflects poor risk management. As well, the Company's confrontational handling of environmental and regulatory matters has simply been counterproductive. These and other correctible deficiencies combine to maintain a "Blankenship Discount" in the market price for Massey Energy's shares, and do a grave disservice to our shareholders by masking the underlying strength of the Company's business, asset and workforce.

80.    In response to the resignation of the two directors, and in an effort to solidify his control over the Company, on June 18, 2007, Blankenship caused the Massey Energy Board to approve an amendment to its Bylaws to reduce the number of authorized board members from ten to eight.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

81.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

82.    Plaintiff is an owner of Massey Energy common stock and was an owner of Massey Energy common stock at all times relevant hereto.

83.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

84.    As a result of the facts set forth herein, Plaintiff has not made any demand on the Massey Energy Board to institute this action against the Individual Defendants. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

85.     The facts, as alleged herein, demonstrate that a majority of the Board who would have reviewed a demand at the time this action was initiated are the very same directors who have served as Board members since at least September 15, 2005 (and in some cases, much earlier). As demonstrated herein, the Director Defendants utterly failed to implement any reporting or information system or controls, or having implemented such a system or controls, consciously failed to monitor or oversee its operations. Thus, the Director Defendants disabled themselves from being informed of risks or problems requiring their attention. All of the Board's directors, at the time this Action was initiated, failed to act in the face known duties. They consciously failed to comply with applicable laws and regulations, causing the Company to be subject to sever penalties and liability.

86.     The Director Defendants consciously failed to prevent or remedy the misconduct alleged herein, causing millions of dollars of losses to the Company in, *inter alia*, actual or potential fines, penalties and tort liabilities.

87.     The Director Defendants were presented with substantial "red flag" warnings that the Company was not in compliance with applicable federal and state statutes and regulations regarding environmental and worker safety. These warnings included the following:

(a)     Easily verified, documented systematic noncompliance with NPDES permits by over 25 of it subsidiaries, reflected in the subsidiaries own records and NOVs received from the State of West Virginia;

(b)     Notification of actions against and settlement of litigation related to various subsidiaries' environmental noncompliance by the WVDEP in 2006 as explained in the EPA's Complaint against the Company and its subsidiaries for CWA violations;

(c)     The October 2000 slurry spill in Martin County, Kentucky, which cost the Company millions of dollars to clean up and which the EPA has described as "the worst environmental disaster in the southeastern United States";

(d)     Two Massey Energy subsidiaries Independence Coal Company's and Omar Mining Company's pleading guilty to federal environmental crimes and receiving five years' probation and the maximum fine of $200,000 as part of a plea agreement with federal prosecutors in December of 2002 that required the Company to institute environmental compliance measures;

(e)     Other repeated and systematic notices of violation and enforcement actions by the state and federal agencies charged with ensuring compliance with laws and regulations to protect the environment and worker safety as summarized above;

(f)     Lawsuits by workers alleging that they have been wrongfully discharged for reporting safety violations, including the lawsuit by the safety monitor resulting from an October 6, 2005 termination that recently resulted in a $1 million punitive judgment against the Company on top of another $1 million in other damages;

(g)     The tragic deaths of two miners in the January 19, 2006 Aracoma Alma #1 Mine fire and the subsequent investigations, reports, lawsuits and fines – all of which was covered extensively by the national media;

(h)     The initiation of a criminal investigation into the Aracoma Alma #1 Mine fire in the Spring of 2006 and its coverage by the media;

(i)     National media coverage as early as the Spring of 2006 of Blankenship's October 19, 2005, "running coal" memorandum to deep-mine supervisors and the implication of its connection with the January 19, 2006 Aracoma #1 Mine fire;

(j)     The handling of the request from MSHA for information and physical evidence by Massey Energy subsidiary and its counsel and the unprecedented lawsuit against the subsidiary by MSHA to compel the production of the needed information and evidence and the publicity generated thereby;

(k)     The special report to the Governor of West Virginia reports from WVOMHST and from MSHA regarding how violations of mandatory health and safety laws caused the Aracoma Alma #1 tragedy; and

(l)     Receipt of a highly publicized $1.5 million fine for the Aracoma Alma #1 tragedy as an Assistant U.S. Secretary of Labor for Mine Safety and Health announced that "[t]he number and severity of safety violations at the mine at the time of the fire demonstrated reckless disregard for safety, warranting the highest fine MSHA has levied for a fatal coalmining accident."

88.     At a minimum, Defendants Gee, Crawford, Fogleson and Moore, who all served on the SEPPC, were aware of these red flags and the chronic control deficiencies that existed at the Company during the Relevant Period. The existence of systemic, repeated egregious and material environmental and labor law violations extending back through at least 2000 cited herein, demonstrate that the Company either had no monitoring policies or procedures in place or that defendants consciously ignored that such policies or procedures were ineffective.

89.     Certain environmental and worker-safety laws and regulations charge the Company's officers and directors with knowledge of the Company's violations of those laws and regulations.

90.     In addition, the directors of Massey Energy cannot be relied upon to reach a truly independent decision as to whether to commence the demanded actions against themselves (as

well as certain of the Company's officers responsible for the misconduct alleged in this complaint) in that, *inter alia*, the Board is dominated by Blankenship who was personally and directly involved in the misconduct alleged and/or who approved the actions complained of, and to whose directives and views the Board has consistently acceded and will continue to accede. This domination of the Board of Directors by Defendant Blankenship has impaired the Board's ability to validly exercise its business judgment and renders it incapable of reaching an independent decision as to whether to institute litigation in this instance.

91.    Defendant Blankenship–who is the singularly most powerful person at the Company—personally directed Massey Energy's environmental and worker protection practices. Blankenship is the Chairman of the Board, chairman of the Company's Executive Committee, and the Company's CEO and President, and, as such, is in a position to and does exercise control over the Company and all aspects of its business, including the activities of the Board of Directors, as well as the Board's unyielding loyalty to Defendant Blankenship, is amply demonstrated by the contents of the letter of resignation written by former Massey Energy directors Loeb and Swanson. That June 13, 2007 letter to Blankenship stated, in relevant part, that ***"[t]he Board clearly shared our view as to the attractiveness and importance of such a transaction, <u>but its misguided insistence on keeping you in place as CEO outweighed strategic considerations and prevented the consummation of a deal that would have been in the best interest of all shareholders</u>."***

92.    That the Company's Board has an unyielding loyalty to Defendant Blankenship (and that the Individual Defendants have consciously and/or recklessly fostered, through systematic inaction, a corporation culture evidencing a willful disregard for applicable legal obligations) is manifested by a 2006 proxy contest that (a) resulted in the election of two new

directors and (b) ended with the subsequent resignation of those same directors less than one year later due to the gamesmanship of Blankenship in controlling the rest of the Board.

93.    As an initial matter, the principal professional occupation and means of earning a living for Defendants Blankenship and Philips is their employment with Massey Energy. Defendant Blankenship's annual compensation amounted to $29.3 million in 2005 and $5.3 million in 2006. Defendant Phillips earned over $2.1 million during 2006. He earned over $1.58 million in 2005. As a result of those employment relationships, Defendants Blankenship and Philips have received (and for as long as they remain in the Company's employ, will continue to receive) valuable financial benefits from Massey Energy—which benefits would be lost if such employment relationships were to be severed by the Company.

94.    Due to employment and other personal relationships, as well as entangling family and financial alliances, interests and dependencies, at least one-half of the Board of Directors is incapable of impartially considering a derivative demand.

95.    Blankenship's brother, George Blankenship, a certified public accountant who, since 1977, has performed accounting services for several of Massey Energy's vendors and independent contractors. Defendant Blankenship's nephew, Keith Blankenship, owns A-A. Several of Massey Energy's subsidiaries purchase automobile and light truck replacement parts from A-A. During the year ended December 31, 2006, the Company's subsidiaries expended an aggregate of $1,096,754 for goods and services provided by A-A.

**Phillips**

96.    Philips reports to Blankenship; and Blankenship is in a position to control Philips' future financial opportunities. Thus, Philips cannot objectively and independently decide to

commence an action against Defendant Blankenship, who, as alleged herein, personally directed Massey Energy's environmental and worker protection practices at issue herein.

**Moore**

97. Defendant Moore is the Chairman of Moore Group, Inc. a multi-franchise auto dealership holding company. As disclosed in the Company's latest definitive proxy statement, several of Massey Energy's subsidiaries purchase vehicles and services from subsidiaries of Moore Group, Inc. Indeed, during the year ended December 31, 2006, the company expended an aggregate of $241,296 for vehicles and services provided by subsidiaries of Moore Group, Inc. Apart from the foregoing, Moore was appointed to the Board by Defendant Blankenship, who personally directed Massey Energy's environmental and worker protection practices at issue herein.

98. In 2004, Moore ran for Governor of West Virginia. According to the West Virginia People's Election Coalition, Moore received a total of $57,087.00 in his 2004 election campaign. Of that, Massey Energy Company donated $17,750.00.

99. Moore held an electoral campaign fund-raising event at the residence of Harless on February 16, 2004.

100. A newspaper article published by the WV Gazette stated that Harless, *the wealthy coal and timber operator from Gilbert,* was a Moore supporter. Harless promised Moore he would help raise money for Moore's campaign, as he had previously raised $250,000 for President Bush in 2000. In this article, Harless stated that he had known Moore *since he was a young man* and that he was *clean as a whistle* politically.

101. Jarosinski, Adkins, Gardner, Harless, Short, G. Blankenship and Inman also donated to Moore's 2004 election campaign.

32

**Inman**

102.    Inman is a long-time friend of Blankenship, who personally directed Massey Energy's environmental and worker protection practices at issue herein. Inman has served alongside Blankenship on the Company's Board of Directors since November 2000. Inman lacks independence from Blankenship and the other members of the Company's senior management team by virtue of his excessively long tenure on the Company's Board, which dates back to 1985.

103.    Demand is also excused because the Defendants' conduct was so egregious on its face that it could not have been the product of sound business judgment. To the contrary, the wrongdoing and harm alleged in this Complaint flows directly from the Individual Defendants' deliberate and conscious decision to permit the sustained and systematic deficiencies that plagued Massey Energy's internal controls. The Individual Defendants were, or should have been, aware of critical facts regarding the fundamental controls breakdown at Massey Energy as evidenced by the Company's repeated violations of legal and regulatory requirements.

104.    Furthermore, demand is excused because it would be futile to require Plaintiff to issue a demand to the Company's Board requesting them to take action against themselves and certain senior Company executives for their intentional or reckless conduct as alleged herein. Not only would this require them to investigate and bring claims against themselves for their own misconduct, but their actions to date prove conclusively that they will not take action.

105.    Because many of the wrongful acts at issue presently are the subject of ongoing litigation (including criminal proceedings), the Company's Board of Directors cannot be expected to reach a truly independent and objective decision about whether to commence and prosecute this action against themselves for the wrongful acts at issue.

106.    If the Individual Defendants herein are protected against personal liability for their acts of mismanagement and breach of fiduciary duty alleged in this Company by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.,* monies belonging to the stockholders of Massey Energy. However, due to certain changes in the language of directors' and officers' liability insurance policies in the pas few years, the directors' and officers' liability insurance policies covering the Defendants in this case contain provisions that eliminate coverage for any action brought directly by Massey Energy against these Defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of Massey Energy, there would be no directors' and officers' insurance protection and this is a further reason why they will not bring such a suit.

## **BREACH OF FIDUCIARY DUTIES**

107.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set for the fully herein.

108.    Each of the Individual Defendants, because of their positions as directors and/or officers of Massey Energy, owed the fiduciary duties of loyalty and due care to the Company and its stockholders in connection with the management and operations of the Company's business and operations.

109.    To properly discharge these duties, the Individual Defendants were required to, among other things:

(a)    manage, conduct, supervise, and direct the business affairs of Massey Energy in accordance with best practices, and applicable state and federal laws, rules, and regulations;

(b)    neither violate nor permit any officer, director, agent, or employee of Massey Energy to violate applicable state and federal laws, rules, or regulations; and

(c)    remain informed as to the status of Massey Energy's business conditions, practices, and operations and, upon receipt of notice of information of imprudent or unsound practices or operations, make a reasonable inquiry in connection therewith, and take steps to correct such practices or operations.

110.    As alleged in detail herein, the Individual Defendants consciously engaged in a sustained and systemic failure to properly exercise their fiduciary duties.

111.    Moreover, each of the Individual Defendants had a duty to Massey Energy and its shareholders to establish and maintain adequate internal controls to ensure that the Company was operated in a prudent and lawful manner. The Individual Defendants had an affirmative obligation to install

112.    internal control systems to discover wrongdoing, which they had ample reason to believe existed. Moreover, where, as here, "red flags" exist, the Individual Defendants had an obligation to take affirmative steps to address such issues.

113.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, Massey Energy has suffered and will continue to suffer damages.

## BREACH OF FIDUCIARY DUTIES

114.    Plaintiff incorporates by references all previous and subsequent paragraphs as if set forth fully herein.

115.     As detailed herein, the Individual Defendants abdicated their responsibility to establish and maintain adequate internal controls at Massey Energy, having made no good faith effort to fulfill their fiduciary duties.  The Individual Defendants did nothing about problems they knew (or should have known) existed at Massey Energy and its subsidiaries.  Rather, they instituted (and through their mere inaction acquiesced in) a corporation culture that encouraged unlawful and irresponsible activity in the name of increased and continued production.

116.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Massey Energy engaged in imprudent, improper and unlawful activities which has caused it to suffer damages, as alleged herein.

117.     Plaintiff demands a trial by jury on these claims.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.     Authorizing the maintenance of this action as a derivative action, with Plaintiff as derivative Plaintiff;

B.     Declaring that the Individual Defendants have violated their fiduciary duties to the Company;

C.     Awarding against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands trial by jury.


HILL WILLIAMS, PLLC
Barry Hill
E-mail: bhill@hwlaw.us
89 12th Street
Wheeling WV 26003
Telephone: 304-233-4966
Facsimile: 304-233-4969

and

SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP
Eric L. Zagar
E-mail: ezagar@sbtklaw.com
James A. Maro
E-mail: jmaro@sbtklaw.com
280 King of Prussia Road
Radnor PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

Attorneys for Plaintiff

By:
Barry Hill, WV ID No. 1722

## VERIFICATION

I, **Vernon Mercier,** hereby verify that I have authorized the filing of the attached

Complaint, that I have reviewed the Complaint, and that the facts therein are true and correct to

the best of my knowledge, information and belief.   I declare under penalty of perjury that the

foregoing is true and correct.

DATE: __8-2-07__

**VERNON A. MERCIER**