## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA
## AT CHARLESTON

VERNON MERCIER, Derivatively on )     **Case No. 2:07-0555**
behalf of MASSEY ENERGY COMPANY, )
                                )
          Plaintiff,         )
                                )
           v.                  )
                                )
DON L. BLANKENSHIP, BAXTER )
PHILLIPS, JR., DAN MOORE, E. )
GORDON GEE, RICHARD M GABRYS, )
JAMES CRAWFORD, BOBBY R. )
INMAN, ROBERT H. FOGLESONG, H. )
DREXEL SHORT, JR., J. CHRISTOPHER )
ADKINS, JEFFREY M. JAROSINSKI, )
LADY BARBARA THOMAS JUDGE, )
STANLEY C. SUBOLESKI, ELIZABETH )
CHAMBERLIN and THOMAS COOK, )
                                )
         Defendants,       )
                                )
          and                )
                                )
MASSEY ENERGY COMPANY, a )
Delaware Corporation )
                                )
       Nominal Defendant. )

## AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

## NATURE AND SUMMARY OF THE ACTION

1.      Plaintiff Vernon Mercier brings this shareholder derivative action (the "Action")

on behalf of nominal defendant Massey Energy Company ("Massey Energy" or the "Company")

against its entire Board of Directors (the "Board") and certain of its executive officers seeking to

remedy their breaches of fiduciary duties and other misconduct.

2.      As alleged in detail herein, from 2000 to the present (the "Relevant Period"), the

Individual Defendants (as defined herein) engaged in a scheme and wrongful course of business

whereby the Individual Defendants blatantly disregarded their fiduciary obligations by failing to

ensure the Company's compliance with legal obligations and failing to remain informed as to the Company's internal controls, failing to make reasonable inquiries in connection with notice of unsound conditions or practices and failing to take steps to correct such conditions or practices.

3.      Defendants' settlement (the "Settlement") of a similar action in the Circuit Court of Kanawha County, West Virginia, *Manville Personal Injury Trust v. Blankenship, et al.*, Case No. 07-C-1333 (the "State Action"), has no preclusive effect on the claims asserted herein because of the constitutionally deficient notice employed by defendants in the State Action. Accordingly, the Board's approval of the deficient notice represents a breach of their fiduciary duties of candor and good faith to Massey Energy shareholders, because the notice, published one day in one publication with virtually no description of the case or the proposed settlement and with no mention whatsoever of the instant Action (which was then pending), was not reasonably calculated to inform Massey Energy shareholders of either the terms of the Settlement or the claims being released. Furthermore, the Board's approval of the Settlement of the State Action was, in and of itself, a breach of their fiduciary duties, as the Board failed to secure any monetary contribution from defendant Don L. Blankenship, to whom the entire Board is beholden, as further described herein. Finally, as detailed herein, even since the execution of the stipulation of settlement in the State Action, the Individual Defendants have continued to breach their fiduciary duties to Massey Energy and its shareholders by, among other things, continuing to operate the Company in a reckless and unsafe manner that has resulted in numerous safety violations, including the death of at least one Massey Energy employee.

## JURISDICTION AND VENUE

4.      This court has subject matter jurisdiction pursuant to 28 U.S.C. §1332 (Diversity Jurisdiction) because the amount in controversy exceeds $75,000.00 exclusive of interest and

costs, and because this is an action by a plaintiff who is a citizen of a different state than all defendants.

5.     Venue is proper in this District pursuant to 28 U.S.C. §1391(a) and (c) as a substantial part of the events or omissions giving rise to the claim occurred in this District.

## **PARTIES**

6.     Plaintiff Vernon Mercier is a shareholder of nominal defendant Massey Energy, was a shareholder of Massey Energy at the time of the wrongdoing alleged herein, and has been a shareholder of Massey Energy continuously since that time.  Plaintiff Vernon Mercier is a citizen of the State of Illinois.

7.     Nominal defendant Massey Energy is a corporation organized and existing under the laws of the State of Delaware with its principal executive offices located at 4 North 4th Street, Richmond, Virginia.  According to the Company's public filings, Massey Energy is the fourth largest coal producer by revenue in the United States.

8.     Defendant Don L. Blankenship ("Blankenship") has served as a director of Massey Energy since 1996 and as the Company's Chief Executive Officer and Chairman of the Board since November 30, 2000 and as Chairman of the Board, Chief Executive Officer and President of affiliate A.T. Massey Coal Company, Inc. ("A.T. Massey") since 1992.  Upon information and belief, Blankenship is a citizen of the state of West Virginia.  The following chart represent Blankenship's annual compensation for the preceding three fiscal years (2007-2005), according to the Company's proxy statements:

| Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|--------|-------|--------------|---------------|----------------------------------------|----------------------------------------------------------------------|------------------------|-------|
| $1,000,000 | $300,000 | $838,129 | $2,035,146 | $5,257,576 | $111,794 | $386,480 | $9,929,125 |

- 3 -

| $1,000,000 | $300,000 | $308,300 | $2,626,137 | $514,054 | $322,640 | $257,291 | $5,328,422 |
|---|---|---|---|---|---|---|---|
| $1,000,000 | $11,475,030 | $790,397 | 433,333 | $15,033,652[1] | $469,881[2] | $65,759 | $29,268,052 |

9.      Defendant Baxter Phillips, Jr. ("Phillips") has served as a director of the Company since 2007.  Phillips was promoted to President of the Company on November 10, 2008 after serving as the Company's Executive Vice President and Chief Administrative Officer since November 2004. Phillips also served as the Company's Senior Vice President and Chief Financial Officer from September 2003 to November 2004, and as Vice President and Treasurer from October 2000 to August 2003. Phillips joined the Company in 1981 and has also served in the roles of Corporate Treasurer, Manager of Export Sales and Corporate Human Resources Manager. Upon information and belief, Phillips is a citizen of the Commonwealth of Virginia.

10.     Defendant Daniel R. Moore ("Moore") has served as a director of the Company since January 22, 2002.  Moore is the Chairman of the Audit Committee and a member of the Compensation Committee, the Governance and Nominating Committee and the Safety, Environmental and Public Policy Committee ("SEPPC").  Moore is also the Chairman of Moore Group, Inc., which owns multiple automobile dealerships in Williamson, West Virginia, since 1999.  Upon information and belief, Moore is a citizen of the State of West Virginia.

11.     Defendant E. Gordon Gee ("Gee") has served as a director of the Company since November 30, 2000.  Gee is Chairman of the SEPPC and is a member of the Audit, Executive, and Governance and Nominating Committees.  Upon information and belief, Gee is a citizen of the State of Tennessee.

---

[1] In 2005, this amount is reflected as "Long Term Incentive Plan."

[2] In 2005, this amount is reflected as "other annual compensation."

12. Richard M. Gabrys ("Gabrys") has served as a director of the Company since May 22, 2007. Gabrys is a member of the SEPPC, Executive and Governance and Nominating Committees. Upon information and belief, Gabrys is a citizen of the State of Michigan.

13. Defendant James Crawford ("Crawford") has served as a director of the Company since February 7, 2005. He is a member of the SEPPC, the Compensation Committee, the Audit Committee and the Governance and Nominating Committee. Upon information and belief, Crawford is a citizen of the Commonwealth of Virginia.

14. Defendant Bobby R. Inman ("Inman") has served as a director of the Company and/or its predecessor since 1985. Inman was formerly Chairman of the Compensation Committee and is now a member of the Compensation Committee, and is a member of the Executive and Governance and Nominating Committees. Upon information and belief, Inman is a citizen of the State of Texas.

15. Defendant Robert H. Foglesong ("Foglesong") has served as a director of the Company since February 21, 2006. Foglesong is the current Chairman of the Compensation Committee and a member of the SEPPC and the Governance and Nominating Committee. Upon information and belief, Foglesong is a citizen of the State of Mississippi.

16. Defendant H. Drexel Short ("Short") served as the Company's Senior Vice President of Group Operations from 1995 to July 12, 2007. Short was formerly Chairman of the Board and Chief Coordinating Officer of Massey Coal Services from 1991 to 1995. Short joined the Company in 1981. Upon information and belief, Short is a citizen of the State of West Virginia.

17. Defendant John C. Adkins ("Adkins") has served as the Company's Senior Vice President and Chief Operating Officer since July 2003. Adkins joined Rawl Sales & Processing

Co., a subsidiary of Massey Energy in 1985. Since that time, he has served as section foreman, plant supervisor, President of the Company's Eagle Energy subsidiary, Director of Production of Massey Coal Services, Inc. and, most recently, Vice President of Underground Production. Upon information and belief, Adkins is a resident of the State of West Virginia.

18.     Defendant Jeffrey M. Jarosinski ("Jarosinski") has served as the Company's Vice President of Finance since 1998 and Chief Compliance Officer since December 2002. From 1998 through December 2002, Jarosinski served as the Company's Chief Financial Officer. Jarosinski joined the Company in 1988. Upon information and belief, Jarosinski is a resident of the Commonwealth of Virginia.

19.     Defendant Lady Barbara Thomas Judge ("Judge") has served as a director of the Company since February 19, 2008. Judge is a member of the SEPPC and the Governance and Nominating Committee. Upon information and belief Judge is a citizen of the United Kingdom.

20.     Defendant Stanley C. Suboleski ("Suboleski") has served as a director of the Company since May 13, 2008. Previously, Suboleski served as Evecutive Vice President and Interim Chief Operating Officer of the Company from 2001 to 2003, and in various positions with A.T. Massey Coal Co. from 1993 to 1997. Suboleski is a member of the SEPPC. Upon information and belief Suboleski is a citizen of the Commonwealth of Virginia.

21.     Defendant Elizabeth Chamberlin ("Chamberlin") has served as the Company's Vice President, Safety and Training since an undisclosed date. Previously, Chamberlin served as Vice President, Safety and Training for Massey Energy subsidiary Massey Coal Services, Inc. from January 2007 until assuming her current position as Massey Energy. Upon information and belief, Chamberlin is a citizen of the Commonwealth of Pennsylvania.

22.     Defendant Thomas Cook ("Cook") has served as the Company's Director of Environmental Affairs since at least January 2007.  Upon information and belief, Cook is a citizen of the State of West Virginia.

23.     Collectively, Defendants Blankenship, Phillips, Moore, Gee, Gabrys, Crawford, Inman, Foglesong, Judge and Suboleski are referred to herein as the "Director Defendants."

24.     Collectively, Defendants Blankenship, Phillips, Moore, Gee, Gabrys, Crawford, Inman, Foglesong, Short, Adkins, Jarosinski, Judge, Suboleski, Chamberlin and Cook are referred to herein as the "Individual Defendants.'

## DUTIES OF THE INDIVIDUAL DEFENDANTS

25.     By reason of their positions as officers and/or directors of Massey Energy and because of their ability to control the business and corporate affairs of Massey Energy, the Individual Defendants owed Massey Energy and its shareholders fiduciary obligations of good faith, loyalty, due care and candor, and were and are required to use their utmost ability to control and manage Massey Energy in a fair, just, honest and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Massey Energy and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Massey Energy and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

26.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Massey Energy, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

27.     To discharge their duties, the officers and directors of Massey Energy were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Massey Energy were required to, among other things:

(a)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;

(b)     remain informed as to how Massey Energy conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state laws, government rules and regulations and the charter and bylaws of Massey Energy;

(c)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations;

(d)     remain informed as to the status of Massey Energy's operations, including its practices in relation to environmental compliance and employee safety and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps necessary to correct such conditions or practices;

(e)     refrain from wasting the Company's assets or unduly benefiting themselves at the expense of the Company;

(f)     maintain and implement an adequate system of internal controls over all aspects of Massey Energy's business and administration;

(g)     act in furtherance of the best interests of Massey Energy and its shareholders, and not in furtherance of their own personal interests; and

(h)     preserve and enhance Massey Energy's reputation and maintain public trust and confidence in Massey Energy as a prudently managed institution fully capable of meeting its duties and obligations.

28.     According to the Company's most recent Proxy Statement, the SEPPC's[3]

responsibilities and duties include:

> (a)     review and make recommendations regarding our policies, programs,
> position and strategies in relation to safety, environmental and public
> policy issues deemed significant by the committee or which may be
> referred to the committee by the Board of Directors or by management;
>
> (b)     review and make recommendations regarding safety, environmental,
> political, and social trends and issues as they may affect our operations
> and the operations of our subsidiaries;
>
> (c)     review and make recommendations in respect of our general policy
> regarding support of business, charitable, educational and political
> organizations;
>
> (d)     review and make recommendations in respect of our safety, environmental
> and public policies and practices; and
>
> (e)     review the adequacy of the committee's charter and recommend any
> changes to the Board of Directors.

29.     As alleged in detail herein, for several years certain of the Director Defendants

completely abdicated their fiduciary duties and instead allowed Blankenship and other Massey

Energy officers to engage in illegal and imprudent conduct at the expense of the Company.

However, starting with the Company's execution of a stipulation of settlement in the State

Action, the Director Defendants again affirmatively breached their fiduciary duties to Massey

Energy and its shareholders by: (i) approving an inadequate notice; (ii) approving a settlement

that failed to hold Blankenship responsible for the significant harms he has caused to the

---

[3] The SEPPC was formerly known as the Public and Environmental Policy Committee ("PEPC"). The PEPC was renamed the SEPPC in or around February 2006. According to the Company's prior Proxy Statements, the principal duties of the PEPC were to: (a) review and make recommendations regarding the policies, programs, position and strategies of the Company in relation to public and environmental issues deemed significant by the Committee or which may be referred to the Committee by the Board or by management; (b) review and make recommendations regarding political, social and environmental trends and issues as they may affect the operations of the Company and its subsidiaries; (c) review and make recommendations in respect of the Company's general policy regarding support of business, charitable, educational and political organizations; and (d) review and make recommendations in respect of the Company's environmental policies and practices.

Company through his reckless leadership; (iii) failing to abide by the terms of the Settlement of the State Action; and (iv) despite the corporate governance measures purportedly enacted pursuant to the Settlement of the State Action, continuing to operate the Company in a reckless and unsafe manner that has resulted in numerous safety violations, including the death of at least one Massey Energy employee.

30.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

## SUBSTANTIVE ALLEGATIONS

### MASSEY ENERGY'S PATTERN OF ENVIRONMENTAL AND WORKER-SAFETY VIOLATIONS

31.     Over at least the last eight years, the Individual Defendants have consciously refused to exercise their fiduciary duties to oversee the affairs of the Company and its subsidiaries.  During the relevant period the Company has been fined substantially at both the state and federal levels for both environmental and worker-safety violations and has permitted multiple employees to die in preventable accidents, which have resulted in numerous lawsuits being initiated against the Company.  This has all occurred in spite of the Company entering into *two separate* corporate governance therapeutic settlements of shareholder derivative actions, which in both instances have utterly failed to reform Massey Energy's corporate culture or take the reigns of power away from Defendant Blankenship, who dominates the Board, and is only concerned with one thing, as denoted in his now infamous memorandum detailed below – "running coal" regardless of the best interests of the Company and the safety and health of its employees.

### Massey Energy's History of Environmental Violations

32.     Massey Energy has an extensive history of violating various environmental laws and regulations, especially the Clean Water Act of 1977 (the "CWA") and the Water Quality Act of 1987.  For example, in December 2002, Massey Energy's subsidiaries Omar Mining Company ("Omar") and Independence Coal Company ("Independence") pled guilty to violating the CWA, and both subsidiaries and Massey Energy entered into an agreement with the Environmental Protections Agency ("EPA") Suspension and Debarment Division which "mandated implementation of a company-wide environmental compliance program, training, independent environmental audits, adequate funding and staffing for environmental compliance, additional reporting requirements of discharges to surface waters, and other conditions."  However, despite several prior enforcement actions, including two criminal plea agreements, settlement of suspension and debarment matters, civil actions by the State of West Virginia and Commonwealth of Kentucky, and private suits by citizens of West Virginia and Kentucky, Massey Energy continued to violate environmental laws and regulations.

33.     For example, in the Company's Discharge Monitoring Reports ("DMR") submitted to the State of West Virginia and Commonwealth of Kentucky, Massey Energy *admitted* that from January 2000 through March 2006,  the Company and its subsidiaries violated the CWA "approximately 4,100 times, resulting in approximately 60,534 days of violations."   Moreover, from just April 2006 through December 2006, Massey Energy's subsidiaries' DMRs documented 533 violations of the CWA (exceeding average monthly permit limits 276 times and exceeding daily maximum limits 257) resulting in approximately 8,537 days of National Pollutant Discharge Elimination System ("NPDES") permit limit violations.  There are only 275 days in the months of April through December, so on average that means that a

Massey Energy subsidiary was in violation of monthly permit limits *every day* over that eight month period.

34. In addition to the documentation of pollution in the Company's own DMRs, state inspectors took samples at the Company's facilities in West Virginia from April through December 2006, which demonstrated an additional 147 violations of NPDES permit effluent limitations, and issued notices pursuant to the West Virginia Surface Coal Mining and Reclamation Act for "21 additional violations of NPDES permit conditions or unpermitted discharges into the waters of the United States."

35. Moreover, in April 2006, Massey Energy subsidiaries Omar, Independence, Marfork Coal Company and Bandmill Coal Corporation settled lawsuits with the West Virginia Department of Environmental Protection for violations of the West Virginia Water Pollutions Control Act occurring through November 30, 2005. However, at least through September 2007, those subsidiaries continued to discharge pollutants into waters of the United States in violation of Sections 301 and 402 of the CWA as reflected in certified DMRs and numerous notices of violations.

36. The previous violations are just some of the more recent examples of Massey Energy's massive history of flagrant violations of environmental laws and regulations. Other past major violations include: (1) in October 2000, a Massey Energy subsidiary was responsible for one of the largest coal slurry spills in United States history; (2) in August 2001, a spill of coal slurry from a Massey Energy subsidiary into Rum Creek; (3) in April 2002, a coal slurry spill into the Tug Fork of the Big Sandy River following a break a coal slurry line at one of Massey Energy's subsidiaries; (4) in July 2002, a slurry spill at a Massey Energy subsidiary; (5) in October 2002, a coal slurry spill into Dehue Creek from a Massey Energy subsidiary; and (6)

erosion of a valley fill at a Massey Energy subsidiary that resulted in flow of mud and water which damaged the property of numerous residents. .

37.    On May 10, 2007, the EPA filed suit (the "EPA Action") in this Court against Massey Energy, A.T. Massey and the Company's subsidiaries in West Virginia and Kentucky, based upon Massey Energy's systemic and atrocious environmental violations.  The EPA Action noted that from January 2000 through March of 2006, Massey Energy subsidiaries' DMRs demonstrated that the subsidiaries violated the CWA "approximately 4,100 times, resulting in approximately 60,534 days of violation."  The EPA Action further alleged that over the same time period independent samples taken by state inspectors demonstrated "534 exedences of permit limits by Massey Energy subsidiaries" and that "Massey Energy subsidiaries received approximately 1,943 Notices of Violation ("NOVs") under the Surface Mining Control and Reclamation Act ("SMCRA") from January of 2000 through March of 2006" and that "[a]t least 255 of these NOVs show violations of the CWA, including 221 that document additional NPDES permits limit violations."   The EPA Action demanded payment of civil penalties estimated to be as much as $2 billion.

38.    On January 18, 2008, Massey Energy announced that the Company had settled the EPA Action for $20 million, and also agreed to implement a number of environmental compliance reforms.  This settlement represented the largest civil penalty in EPA's history levied against a company for wastewater discharge permit violations.  In addition to the monetary penalty, Massey Energy is required to invest approximately $10 million to develop and implement a set of procedures to prevent future violations.  Massey Energy must also set aside 200 acres of riverfront land in West Virginia for conservation purposes and protection from future mining, and is also required to perform 20 projects downstream from mining operations.

### Massey Energy's History of Worker-Safety Violations

39.     Massey Energy's track record with respect to employee safety laws and regulations is no better than its environmental record. Similar to the Company's systemic disregard for the laws prohibiting polluting waterways, since at least 2000 Massey Energy has been cited for numerous violations of worker health and safety regulations, including receiving: (a) two U.S. Department of Labor - Mines Safety and Health Administration ("MSHA") "unwarrantable failure" and "high negligence" violations of federal mine standards in connection with a massive coal slurry spill in October 2000; and (b) four MSHA violations of federal mine safety rules in connection with the death of a miner in February 2001. Additionally, Massey Energy was found liable for improperly terminating two employees for reporting safety violations at Massey Energy's mines, costing the Company over $4.5 million. One of the Massey Energy employees, Rocky Allen Burns, was Independence's in-house safety inspector, who was terminated for reporting mandatory heath and safety violations to MSHA just weeks before Blankenship's "running coal" memorandum was issued, as detailed below.

40.     Massey Energy's complete and utter disregard for worker health and safety is directly tied to the profit-first corporate culture fostered by the Board and management of the Company. For example, on October 19, 2005, defendant Blankenship, sent to all deep-mine superintendents, as well as defendants Short and Adkins, a memorandum (the "October 2005 Memorandum") which stated:

> SUBJECT: RUNNING COAL
>
> If any of you have been asked by your group presidents, your supervisors, engineers or anyone else to do anything other than run coal (i.e. – build overcasts, do construction projects, or whatever), you need to ignore them and run coal. This memo is necessary because we seem not to understand that the coal pays the bills.

41.     Just a few months later, on January 19, 2006, a fire at the Aracoma Alma #1 mine (the "Aracoma Fire") located in West Virginia claimed the lives of two miners, Don Bragg and Ellery Hatfield.   The widows of these two miners have raised substantial allegations in a wrongful death lawsuit against Massey Energy, Massey Energy subsidiary A.T. Massey and defendant Blankenship personally.   The widows alleged in their court filings that evidence demonstrates that Blankenship's personal actions on behalf of the Company and A.T. Massey are sufficient to hold each of them liable for the deaths of the miners.  The filings contain extensive witness statements that explain Blankenship's October 2005 Memo is a microcosm of the ingrained corporate culture at Massey Energy that prioritizes production over safety, citing specific examples regarding compensation incentives and exacting production reports from subsidiaries to the Company every two hours.   The widows further alleged that the corporate culture caused the deaths of Don Bragg and Ellery Hatfield because A.T. Massey's management "actively engaged in bypassing safety mechanisms in order to keep up production."

42.     As an example of the effect of Massey Energy's profit-first corporate culture, the widows' submission to the court quotes an interview with Larry E. Browning, a headgate operator at the Alma mine, as follows:

> A.      And outside, you know, they want you to run coal, you know.
>
> ***
>
> Q.      As a miner, and I know you don't have a lot of experience in the mines, but do you have any suggestions or maybe thoughts on why they don't have air there on that longwall?
>
> A.      Yeah, in a hurry to run coal.  Just basically, they want you to hurry up and run it.
>
> Q.      So, it's more production oriented, you think?
>
> A.      Yeah.  It's like a fast-food restaurant to me, you know, hurry up and get it up, hurry up and get it up.

Q.  Do you feel in jeopardy in any way that if you were to complain to your boss that you didn't have adequate ventilation, that you would stand to –

A.  Oh, yeah.

Q.  – be reprimanded or something?

A.  Nobody – the whole mine I think is like that, you know. Nobody says hardly anything. I mean, I ain't saying they would just up and fire you, but they wouldn't my opinion, they wouldn't listen to you. And if you did really push the issue, you'd probably head out the door, I'd say.

43.  On November 10, 2008, Don Bragg's and Ellery Hatfield's widows' wrongful death lawsuit went to trial. Since the beginning of the trial, eight current and former supervisors have declined to testify citing their right against self-incrimination under the Fifth Amendment.

44.  In addition to the wrongful death lawsuit, a grand jury has been convened to investigate the circumstance surrounding the Aracoma Fire to determine if criminal charges should be brought.

45.  As a result of the Aracoma Fire, on March 29, 2007, MSHA levied a fine of $1.5 million against the Company's subsidiary, with the Assistant U.S. Secretary for MSHA stating "[t]he number and *severity of safety violations at the mine at the time of the fire demonstrated reckless disregard for safety*, warranting the *highest fine* MSHA has levied for a fatal coal mining incident." (emphasis added).  Moreover, Massey Energy's management and Board actually took affirmative steps to *hinder* MSHA's investigation of the Aracoma Fire, forcing MSHA, for the first time in the regulator's history, to bring suit against the mine operator to "provide relevant documents in an investigation" which were needed "to determine the root cause(s) of the fire to help prevent similar accidents from occurring in the future." Independently, the West Virginia Office of Miner's Health, Safety and Training undertook its own investigation of the Aracoma Fire and cited the Massey Energy subsidiary with 168 notices of violation, seven of which contributed to the deaths of the two miners. Also, in a report issued

pursuant to the West Virginia Governor's request, the former assistant secretary of the United States Department of Labor concluded with regard to the Aracoma Fire that, "conditions should have been detected and steps taken to remove the risks, but they were not. This fire was preventable, but it was not prevented."

46.     Tragically, Massey Energy and its subsidiaries continue to violate safety laws and regulations, resulting in further loss of life. On June 15, 2007, MSHA sent letters to two Massey Energy subsidiaries alleging that the operators had committed a pattern of safety violations – one had been cited for 80 violations and the other 250 violations since January 2005. According to MSHA, these letters are indicative of the agency's increased emphasis on worker safety, which was demanded by the public and their representatives, in part, because of the Aracoma Fire tragedy. Moreover, as detailed below, even after Massey Energy entered into the Settlement of the State Action, the Company has been cited with safety violations and at least one employee has been killed.

### THE 2002 SHAREHOLDER DERIVATIVE ACTION AND 2005 SETTLEMENT

47.     In the midst of the preceding pattern of environmental and worker-safety violations, on August 5, 2002, a Massey Energy shareholder filed in the Circuit Court of Boone County, West Virginia a derivative action on behalf of nominal defendant Massey Energy (the "2002 Action"). The defendants in the 2002 Action included, among others, Defendants Blankenship, Moore, Gee, Inman and Jarosinski.

48.     The complaint filed in the 2002 Action contained entire sections dedicated to Massey Energy's "Labor and Employment Law Violations" and "Environmental Law Violations." The Labor and Employment Law Violations section included incidents of the Mine Safety and Health Administration ("MSHA") citing Massey Energy's Martin Co. facility with two "unwarrantable failure" and "high negligence" violations of federal mine safety standards,

- 17 -

and Massey Energy being cited with four violations of federal mine and safety rules following the death of a miner at Massey Energy's Marfork subsidiary.

49.     The Environmental Law Violations section was extensive and included numerous allegations of the West Virginia Department of Environmental Protection citing Massey Energy and its subsidiaries for blackwater spills, improper maintenance of waste ponds, fish kills and other problems.  Massey Energy's Marfork complex was cited with 37 violations relating to water quality in less than six years, prompting state inspector Tom Wood to testify that Massey Energy "[was] aware of the problems" and that Marfork was "worse than any other operation I have inspected."  Similar violations were occurring throughout the Massey Energy family of companies.  Massey Energy's Independence facility and Green Valley facility each faced chronic water quality violations problems.  In addition, both Massey Energy subsidiaries Martin Co. and Sydney Coal Co. suffered major coal slurry spills.  In each case government officials blamed Massey Energy's negligence in its operation of the facilities as the cause of the spills.

50.     Massey Energy and the individual defendants to the 2002 Action entered into a settlement agreement on September 14, 2005 (the "2005 Settlement").  The 2005 Settlement was comprised of three corporate governance terms:

> (a)     **Reduction in the Percentage of Shareholder Vote Required to Amend the By-Laws**.  The Board shall recommend in the Proxy Statement for the next Annual Meeting of Shareholders that the requirement for amendment of the by-laws by shareholders be lowered 80% to 67% of total voting power of all outstanding shares.  Approval of this change will require an affirmative vote of 80% of the total voting power of all outstanding shares, as mandated by Articles Sixth, Sixteenth and Seventeenth of the Company's Restated Certificate of Incorporation.

> (b)     **Expansion of the Board of Directors and Appointment of New Directors**.  The Board of **Directors** shall increase its size from 8 to between 8 to 12 directors, with the actual number to be determined by the Board of Directors from time-to-time; and

(c) **Director Retirement**. The **Board** of Directors shall lower the mandatory retirement age for directors from 78 to 74 (excluding current directors) with one Board of Directors approved exemption at any time.

51.     The goal of these measures was apparently to provide for more independence at the Board level that would lead to a change in the culture of Massey Energy's decision-makers. Notably, notice provided to shareholders pursuant to the 2005 Settlement consisted of "mailing the Notice of Derivative Action (the "Notice") . . . to all shareholders of [Massey Energy] as of August 10, 2005." On December 9, 2005, nearly three months after the parties to the 2005 Settlement had submitted preliminary approval papers, the Honorable E. Lee Schlaegel, Jr. entered an order finally approving the 2005 Settlement. Unfortunately, as detailed herein, the corporate governance terms enacted in the 2005 Settlement did not seem to have any effect on Massey Energy's decision-makers, and the Individual Defendants continued their pattern of environmental and worker-safety violations which severely damaged the Company.

## THE SETTLEMENT OF THE STATE ACTION

52.     On or about June 29, 2007, a purported Massey Energy shareholder initiated the State Action alleging many of the same environmental and worker-safety violations that were alleged in the 2002 Action, as well as additional allegations of environmental and worker safety violations committed by Massey Energy following the 2005 Settlement.

53.     On May 20, 2008, the parties to the State Action entered into a settlement stipulation (the "Stipulation") and submitted the proposed settlement and a proposed form of notice (the "Notice") to the Circuit Court of Kanawha County, West Virginia (the "State Court") for preliminary approval. On the same day, the State Court preliminarily approved the Settlement, approved the Notice and set a hearing date for June 25, 2008. The State Court subsequently gave final approval to the Settlement at the hearing on June 25, 2008.

The Defective Notice Program in State Court

54.    On May 23, 2008, Defendants published the Notice in the WALL STREET JOURNAL. The Notice stated, in full:

> NOTICE OF PROPOSED
>
> SETTLEMENT OF DERIVATIVE ACTION
>
> TO: ALL HOLDERS OF MASSEY ENERGY COMPANY ("MASSEY") STOCK
>
> YOU ARE HEREBY NOTIFIED that Plaintiff, the Individual Defendants, and Massey have entered into a settlement to resolve certain claims asserted in the action captioned above (the "Action").
>
> PLEASE BE FURTHER ADVISED that pursuant to a Court order, a hearing will be held on June 25, 2008, at 1:30 p.m., before the Honorable James C. Stucky , Judge of the Circuit Court of Kanawha County, West Virginia at the Kanawha County Courthouse, 111 Court Street, Judicial Annex, Sixth Floor, Charleston, WV 25328, for the purpose of determining: (1) whether the proposed settlement of the Action, as set forth in the Stipulation of Settlement on file with the Court, should be approved by the Court as fair, reasonable and adequate to Massey; (2) whether judgment should be entered, dismissing the Action with prejudice as against the Individual Defendants and Massey and releasing the Released Parties as defined in the Stipulation of Settlement; and (3) whether plaintiff's counsel's request for payment of attorneys' fees and reimbursement for expenses in the aggregate amount of $2.7 million should be granted.
>
> If you currently own Massey stock and you have questions, you may contact the following:
>
> MOTLEY RICE LLC
> Joseph F. Rice
> Ann K. Ritter
> Badge Humphries
> P.O. Box 1792
> 28 Bridgeside Boulevard
> Mount Pleasant, SC 29464
>
> Counsel for Plaintiff
>
> RIGRODSKY & LONG, P.A.
> Seth D. Rigrodsky
> Brian P. Long
> 919 North Market Street, Suite 980

Wilmington, DE 19801

Counsel for Plaintiff

CRAVATH, SWAINE & MOORE LLP
Ronald S. Rolfe
Julie A. North
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019

Counsel for Defendants

If you are a Massey shareholder, you can object to the proposed settlement and/or plaintiff's counsel's application for fees and expenses. To object to the proposed settlement and/or plaintiff's counsel's application for fees and expenses, you must send a signed letter saying so in *Manville Personal Injury Trust v. Blankenship*, Case No. 07-C-1333. Your objection must include your name, address, telephone number, how many Massey shares you own, a detailed description of your specific objections to any matter before the Court, and all the grounds for your objection to the proposed settlement and/or plaintiff's counsel's application for fees and expenses. You must also include all documents you wish the Court to consider. You must mail your objection and any supporting papers to the Court at Clerk of the Circuit Court of Kanawha County, West Virginia, 111 Court Street, Post Office Box 2351, Charleston, West Virginia, 25328, and to each of the parties at the addresses provided below to arrive no later than June 16, 2008. YOUR OBJECTION MUST RECEIVED BY THIS DATE TO BE CONSIDERED. You may object either on your own or through an attorney hired at your own expense. You or an attorney retained by you may, but is not required to, appear at the settlement hearing. If you or your attorney intend to appear at the settlement hearing, you or your attorney must file a notice of intent to appear with the Court and provide copies to counsel for the parties at the addresses set forth below no later than June 16, 2008.

If you do not take steps to object to the proposed settlement and/or plaintiff's counsel's application for fees and expenses, you will be bound by the Order and Final Judgment of the Court, you will be forever be barred from raising an objection to such proposed settlement, and/or plaintiff's counsel's application for fees and expenses, and certain claims you might have may be released.

You may obtain further information by contacting the following:

MOTLEY RICE LLC

Joseph F. Rice
Ann K. Ritter
Badge Humphries
P.O. Box 1792
28 Bridgeside Boulevard
Mount Pleasant, SC 29464

Counsel for Plaintiff

RIGRODSKY & LONG, P.A.
Seth D. Rigrodsky
Brian P. Long
919 North Market Street, Suite 980
Wilmington, DE 19801

Counsel for Plaintiff

CRAVATH, SWAINE & MOORE LLP
Ronald S. Rolfe
Julie A. North
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019

Counsel for Defendants

DO NOT TELEPHONE THE COURT REGARDING THIS NOTICE .

Dated: May 20, 2008                    BY ORDER OF THE CIRCUIT
COURT OF KANAWHA COUNTY, WEST VIRGINIA

55.     As noted above, the Notice did not contain any information regarding the claims that had been brought and were being settled in the State Action, or who the defendants were. It referenced the Stipulation without giving Massey Energy shareholders any viable way to obtain or review it, contained no mention of the instant Action (which was then pending), and did not provide attorney phone numbers so shareholders could obtain more information about the Settlement.  Moreover, the schedule proposed by the parties gave Massey Energy shareholders

only 14 business days to attempt to inform themselves about the Settlement before having to file an objection. These deficiencies in the Notice failed to comport with federal due process.

56.     The defective Notice, which was approved by the Director Defendants along with the rest of the Settlement, was a breach of the Director Defendants' fiduciary duty of candor because it failed to provide sufficient information for Massey Energy's shareholders to reasonably evaluate the Settlement. Specifically, the Notice failed to: (i) apprise Massey Energy shareholders that there was a parallel federal action; (ii) apprise Massey Energy shareholders of the nature and substance of the State Action; and (iii) apprise Massey Energy shareholders of the claims that would be released by the Settlement. Furthermore, the Director Defendants breached their fiduciary duty of good faith because the Notice was clearly ***not*** reasonably calculated, under all circumstances, to apprise Massey Energy shareholders of the pendency of the action and afford them an opportunity to present their objections.

Agreeing to the 2008 Settlement Was a Breach of the Directors' Fiduciary Duties

57.     Like the Notice, the Settlement itself was defective. Similar to the 2005 Settlement, the Settlement called only for corporate therapeutic relief on the part of Massey Energy to resolve the claims of environmental and worker-safety violations overseen by certain of the Individual Defendants that had resulted in tens of millions of dollars in fines and judgments levied against the Company. The Stipulation required amendments to the Company's SEPPC charter, "enhanced" safety and environmental auditing and reporting procedures, the creation of vice presidential positions for safety practices (Defendant Chamberlin) and environmental practices (Defendant Cook), and the provision for new employee reporting procedures relating to unsafe working conditions and environmental compliance, including a "whistleblower telephone hotline."

- 23 -

58.     In light of the substantial damages wrought upon the Company as a result of Blankenship and certain of the other Individual Defendants' mismanagement as described in detail above, the Board's agreement to the terms of the Settlement was a breach of their fiduciary duties to Massey Energy shareholders because the Director Defendants entered into the Settlement solely to protect Blankenship and the other Individual Defendants (including the Director Defendants themselves) from liability for the massive damages they caused Massey Energy, not because the Settlement was in the best interests of the Company and its shareholders.

Failure Even to Comply with the Terms of the 2008 Settlement

59.     Even more egregiously, the Director Defendants further breached their fiduciary duties by *failing even to comply with the modest terms of the Settlement* as set forth in the Stipulation.

60.     The Massey Energy Company Corporate Governance Agreement (the "Corporate Governance Agreement"), attached as Exhibit 2 to the Stipulation of Settlement, states that "[w]ithin 60 days after the issuance of an Order approving the settlement of this action, the Company's Board of Directors will adopt resolutions and/or amend the Corporate Governance Guidelines and Committee Charters to ensure adherence to the following Corporate Governance Policies." The State Court's Order approving the Settlement was issued on June 30, 2008, which means that all of the agreed-to corporate governance terms were required to be implemented by the Company no later than August 29, 2008. However, to date the Company has failed to fully adopt a number of the provisions of the Settlement, as detailed below.

61.     Section A of the Corporate Governance Agreement requires certain amendments to the Company's SEPPC Charter. In particular, Subsection 3 of Section A requires the following amendment to the Charter:

> The SEPPC shall have the authority to retain independent, outside consultants to assist it with regard to its duties in connection with the Company's compliance with environmental, worker, and mine safety laws, rules and regulations. Before retaining any such consultant, the SEPPC shall make a determination that the consultant is capable of exercising independent judgment. *In making this determination, the SEPPC shall consider the revenue the consultant has received for services performed for the Company during the past five (5) years.*

(Emphasis added).

62.     The highlighted portion of the above provision is an important component of the SEPPC's determination of an "independent" consultant's actual independence. The rationale for such a requirement is clear because a consultant, whose true independence is a necessity for an unbiased review of the Company's environmental and worker safety compliance, may be rendered dependent on the Company for its revenue, which may invariably lead to that consultant acquiescing to the viewpoint of its benefactor rather than providing a truly independent evaluation of the critical areas of Massey Energy's safety and environmental compliance.

63.     Notwithstanding the clear requirements of the Corporate Governance Agreement, Section A, Subsection xi of the SEPPC Charter, as amended effective August 19, 2008 and as posted on the Company's website,[4] merely states that the SEPPC shall:

> have the authority to retain independent, outside consultants to assist the Committee with regard to the Committee's duties in connection with the Company's compliance with environmental, worker, and mine safety laws, rules and regulations. Before retaining any such consultant, the Committee shall make a determination that the consultant is capable of exercising independent judgment.

Hence, the Board simply ignored and failed to implement the requirement that the SEPPC Charter include the provision mandating that the SEPPC "shall consider the revenue the

---

[4] A date stamped copy of the SEPPC charter printed from the Company's website is attached hereto as Exhibit A.

consultant has received for services performed for the Company during the past five (5) years." The Director Defendants' deliberate failure to add this crucial clause to the SEPPC Charter is a clear violation of the Settlement and is a clear breach of their fiduciary duties to Massey Energy and its shareholders.

64.     Section B, Subsection 4 of the Corporate Governance Agreement provides:

> The SEPPC shall recommend that the Board adopt quantitative goals, based on current technologies, for reducing environmental violations and mine safety incidents and near misses with high potential for injury in connection with its operations. The Corporate Responsibility report shall report on the progress on these goals to shareholders in 2008.

65.     Notwithstanding the clear requirements of the foregoing provision, Massey Energy's Corporate Social Responsibility Report for 2008 (the "Corporate Responsibility Report"),[5] while providing some limited information on Massey Energy safety incidents and environmental violations, clearly fails to set forth any "quantitative goals" nor any report on the Company's progress with regard to any such goals.

66.     The Corporate Responsibility Report is signed by Defendants Blankenship, Phillips, Chamberlin and Cook. At a minimum, Defendants Blankenship, Phillips, Chamberlin and Cook, as well as the other Director Defendants who are members of the SEPPC, blatantly violated the terms of the Settlement and breached their fiduciary duties to Massey Energy and its shareholders by failing to ensure that the Corporate Responsibility Report contained the information required by the Settlement.

67.     Section C, Subsection 3 of the Corporate Governance Agreement provides, in relevant part:

> The Company will disclose in the Company's proxy **and on its website** a whistleblower telephone hotline for employees to make confidential

---

[5] A true and correct copy of the Corporate Responsibility Report is attached hereto as Exhibit B.

> and/or anonymous reports of instances of unsafe working conditions and
> environmental compliance issues to the Company.

(Emphasis added).

68.     While the Company has not yet released a proxy statement since execution of the

Stipulation, a thorough review of the Company's website indicates that no such "whistleblower

telephone hotline for employees" exists.  In fact, the only telephone numbers found on the

Company's website are the following:

(a)     In the Investor Relations tab of the Investor Relations Section of the
website it states: "Massey Energy Company P.O. Box 26765 Richmond,
VA      23261      Phone:     (866)      814-6512      E-mail
Investor@masseyenergyco.com"

(b)     In the Corporate Governance tab of the Investor Relations section of the
website it states:

(1)     "Shareholders and other parties interested in communicating
directly with the Lead Director or with the non-management
directors as a group may do so by writing to Lead Director c/o
Corporate Secretary, Massey Energy Company P.O Box 26765
Richmond, Virginia 23261";

(2)     "Concerns relating to accounting, internal controls or auditing
matters can also be communicated directly to the Audit Committee
as follows":

•       "by calling the Massey Energy Ethics Hotline toll free at 1-
888-424-2417";[6]

•       "by mail to the Audit Committee at Board of Directors -
Audit Committee c/o Corporate Secretary Massey Energy
Company P.O Box 26765, Richmond, Virginia 23261";

•       "by mail anonymously to the Audit Committee at Alert
Line Ref: Massey Energy PMB 3767, Charlotte, NC
28277";

---

[6] Notably, the section of the website detailing the "Massey Energy Ethics Hotline" mentions nothing
regarding reporting instances of unsafe working conditions and environmental compliance issues, but
rather is purely concerned with "accounting, internal controls and auditing matters" to be communicated
to the internal audit department or the Audit Committee.

- "by email at the following address Massey.Hotline@masseyenergyco.com."

(c)     In the Information Request tab of the Investor Relations Section of the website it states: "Investor Relations Contact, Investor Relations Department, Massey Energy Company P.O. Box 26765, Richmond, VA 23261, Phone: (866) 814-6512, E-mail: Investor@masseyenergyco.com";

(d)     In the Contact Information of the Corporate Section of the website it states: "Massey Energy Company P.O. Box 26765 Richmond, Virginia 23261, 804-788-1800".

69.     Once again, the Director Defendants breached their fiduciary duties to Massey Energy and its shareholders by simply ignoring the clear requirements of the Settlement.

70.     The Individual Defendants' failure to comply with the terms of the Settlement entered into just a few short months ago demonstrates that the same corporate culture championed by Defendant Blankenship of coal production first, safety and environmental concerns second, continues to be employed at Massey Energy. The Individual Defendants have breached their fiduciary duties by failing to implement required terms of the Settlement, and this failure is just further evidence of the Director Defendants' breach of their fiduciary duties by even entering into a settlement with no teeth that continues to allow Defendant Blankenship and his cronies to run amok in their detrimental management of the Company.

## THE INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTY AFTER THE STATE ACTION SETTLEMENT

71.     Even after the Director Defendants executed the Stipulation in the State Action, the Individual Defendants continued to abrogate their responsibilities in flagrant breach of their fiduciary duties, as alleged in detail herein. These further breaches of fiduciary duties have harmed not only the Company, but also its employees.

72.     On or about September 19, 2008, Massey Energy Employee James O. Woods was involved in an accident and suffered serious spinal injuries. On October 4, 2008, Mr. Woods

died from his injuries. The Mine Safety and Health Administration ("MSHA") categorized the incident as a coal mining fatality.

73.     On or about October 26, 2008, Massey Energy was cited and fined by the U.S. Occupational Safety and Health Administration ("OSHA") for an incident which involved the death of Massey Energy employee Ricky Collins, Sr. Following an extensive investigation of the incident, OSHA concluded that Massey Energy "did not furnish employment and a place of employment which were free from recognized hazards that were likely to cause death or serious physical harm to the employees." As a result of this serious violation OSHA imposed a $2,250 fine to which Massey Energy agreed to pay.

74.     These incidents further demonstrate that the therapeutic Settlement of the State Action has done nothing to change Massey Energy's corporate culture, which continues to push coal production over worker safety. These incidents continue to expose Massey Energy to substantial liability, and the Individual Defendants' continued failure to maintain adequate safety standards is a breach of their fiduciary duties, especially in light of the purportedly "robust" changes in the Company's safety policies and practices that were supposed to be enacted pursuant to the Settlement.

## DEFENDANT BLANKENSHIP'S EXCESSIVE COMPENSATION

75.     Over the past three years Defendant Blankenship has received over $44.5 million, 283,333 stock options and 150,000 stock appreciation rights ("SARs") in compensation,[7] far outpacing the compensation paid to the CEOs of most of the companies in Massey Energy's self-defined peer group (the "Comparator Group") as delineated in Massey Energy's 2008 Proxy

---

[7] Massey calculated the monetary value of Blankenship's equity awards for 2006 and 2007, but not for 2005 wherein he was awarded 283,333 stock options and 150,000 SARs. Certain of Massey's peers calculated their respective Chairman's or CEO's compensation in a similar manner as demonstrated below.

Statement.   The Comparator Group is comprised of the following companies: Allegheny Technologies, Inc. (CEO received approximately $48.97 million over the last three years), Alliance Resource Partners, L.P. (CEO received approximately $7.03 million over the last three years), Alpha Natural Resources, Inc. (CEO received approximately $10.54 million over the last three years), AmeriGas Partners, L.P. (Chairman received approximately $20.92 million over the last three years), Arch Coal, Inc. (CEO received approximately $13.21 million over the last three years), Carpenter Technology Corporation (CEO received approximately $8.8 million over the last three years), Cleveland-Cliffs Inc. (CEOs received approximately $12.34 million over the last three years), CONSOL Energy Inc. (CEO received approximately $25.47 million and 81,645 stock options over the last three years), Foundation Coal Holdings, Inc. (CEO received approximately $5.38 million over the last three years), Freeport-McMoran Copper & Gold, Inc. (Chairman received approximately $138.09 million over the last three years), Overseas Shipholding Group, Inc. (CEO received approximately $12.79 million and 44,791 stock options over the last three years), Peabody Energy Corporation (CEO received approximately $19.41 million over the last three years) and Quanex Corporation (CEO received approximately $11.59 million and 123,300 stock options over the last three years).[8]   Accordingly, Blankenship's compensation, excluding non-monetized equity awards, over the last three years is nearly double

---

[8] Notably, on August 21, 2007, the SEC questioned Massey Energy's self-defined Comparator Group stating: "Please provide further context to your discussion and disclose in greater detail why you choose to benchmark against the variety of companies you reference in your disclosure.  In addition, indicate whether the compensation committee adjusts its analysis based on consideration of the variation in size of the companies in your comparator group."  For example, Allegheny Technologies, Inc.'s revenue was $3.54 billion for 2005, $4.94 billion for 2006 and $5.45 billion for 2007, more than double Massey Energy's revenues of $2.20 billion, $2.22 billion and $2.41 billion for the same years, respectively. Similarly, Freeport-McMoran Copper & Gold, Inc.'s revenue was $4.18 billion for 2005, $5.79 billion in 2006 and $16.94 billion in 2007, far greater than Massey Energy's revenues for the same period.

the average compensation over the same period for the most highly compensated executive or director in the Company's own self-defined Comparator Group.

76.     In addition to his monetary compensation, Blankenship receives numerous perks at the expense of the Company, including, but not limited to, housing arrangements and access to the Company's corporate jets for personal use.

77.     In spite of his wrongful conduct that led to the EPA Action, this Action and the State Action, and the wrongful termination lawsuits, on November 13, 2007 the Company entered into a letter agreement (the "Letter Agreement") with Blankenship extending his employment through December 31, 2009.     The terms of Blankenship's employment compensation under the Letter Agreement are as follows:

> i) a base salary of $83,333 per month; (ii) a target cash incentive  bonus award for fiscal year 2008 of $900,000 and a target cash incentive bonus award for fiscal year 2009 of $900,000, each based on the achievement of certain performance objectives set by the Compensation Committee for fiscal years 2008 and 2009, respectively; (iii) long term incentive awards, subject to the terms, conditions and performance and service-based requirements of the grants made to employees participating in the Registrant's 2008 and 2009 Long Term Incentive Programs . . ., which includes, for each 2008 and 2009 Long Term Incentive Program, four components: a $300,000 target cash incentive award based on the achievement of a certain performance objective, 50,000 non-qualified stock options, 12,700 shares of restricted stock, and 7,300 restricted stock units; (iv) two performance-based restricted unit awards for each of fiscal years 2008 and 2009, one for a total of 120,000 units (assuming the achievement of Level 1 targeted performance for all the performance objectives) and the other for a total of 70,000 units (assuming the achievement of Level 2 targeted performance for all the performance objectives) which shall vest, in whole or in part, based on the achievement of certain performance objectives set by the Compensation Committee for fiscal years 2008 and 2009, respectively; (v) two performance-based cash incentive awards for each of fiscal years 2008 and 2009, one for a total of 90,000 units (assuming the achievement of Level 3 targeted performance for all the performance objectives) and one for a total of 200,000 units (assuming the achievement of Level 4 targeted performance for all the performance objectives) which shall be earned, in whole or in part, based on the achievement of certain performance objectives set by the

Compensation Committee for fiscal years 2008 and 2009, respectively, which for fiscal year 2008 shall be equal to the number of earned units times the closing market price of the Registrant's common stock on the New York Stock Exchange on the last trading day of 2008, and for fiscal year 2009 shall be equal to the number of earned units times the closing market price of the Registrant's common stock on the New York Stock Exchange on the last trading day of 2009; (vi) an additional stock option award for each of fiscal years 2008 and 2009 of 200,000 non-qualified stock options granted, for the 2008 award, on November 13, 2007 and, for the 2009 award, on or before December 29, 2008, with exercise prices based on the closing market price of the Registrant's common stock on the New York Stock Exchange on such dates with service-based vesting, for the 2008 award, on December 30, 2008 and, for the 2009 award, on December 30, 2009, that once vested must be exercised in the first twenty days exercise is permissible pursuant to the Registrant's trading window policy and applicable securities laws; (vii) a retention cash bonus award of $300,000 if employed through December 30, 2008 and a retention cash bonus award of $300,000 if employed through December 30, 2009; and (viii) the premium payments during 2008 and 2009, if any, on split dollar life insurance policies owned by the Registrant with death benefit endorsements payable to Mr. Blankenship, his estate or designated beneficiaries, totaling $4,000,000.

78.     In addition to the specific remuneration above, the Letter Agreement provides that "Mr. Blankenship will continue to participate in the employment benefit plans and arrangements provided by the Registrant to its other employees and be entitled to receive perquisites provided to him in keeping with past practice, including but not limited to, use of the Registrant's airplanes." The Letter Agreement also transferred title to Blankenship of a company-owned residence and associated property in Sprigg, West Virginia effective January 1, 2008. This transfer was recommended by the Compensation Committee and approved by the Board.

79.     All of Blankenship's excessive compensation was approved by the Compensation Committee, comprised of Defendants Crawford, Foglesong, Inman and Moore. Blankenship, through his position as Chairman of the Board and his personal connections with Defendants Crawford, Foglesong, Inman and Moore, dominates the Compensation Committee, which has failed to assert its independent judgment with respect to Blankenship's compensation.

Accordingly, Defendants Crawford, Fogelsong, Inman and Moore have breached their fiduciary duties of loyalty and good faith to the Company and its shareholders by excessively compensating Blankenship.

80.     The Compensation Committee's approval of Blankenship's excessive compensation is particularly inappropriate in light of the massive fines and penalties that have been levied against the Company, as detailed herein, as well as the likely huge damage awards stemming from the wrongful death lawsuits in connection with the Aracoma Fire.

81.     Massey Energy shareholders have attempted to loosen Blankenship's grip on the Company, to no avail.  On September 19, 2005, Third Point LLC ("Third Point") filed with the SEC a Form 13D disclosing that it had purchased 5.9% of Massey Energy common stock on the open market.  In its filing with the SEC, Third Point included a letter addressed to Defendant Blankenship, charging that Massey Energy was poorly managed, and that as a result, the returns to shareholders were depressed.  Third Point also called for Blankenship to be removed as CEO, citing a "Blankenship Discount" factored into the stock price:

> Such a discount may be attributable to the Company's many operating glitches, disappointments in earnings and recent failure to hedge its diesel costs .... Accordingly, we demand that any free cash flow be returned to shareholders via a share repurchase.... Should you and the Board remain like deer frozen in the headlights, I am certain that, with the constitution of the Company's shareholder base, we could rally support for new leadership to manage the company and its capital structure more effectively.

82.     Massey Energy appeared to partially capitulate to shareholder demands on November 15, 2005, when the Company announced that it would repurchase up to $500 million of its stock beginning in the second half of 2006.  However, in January 2006, the Company announced that it had lowered its expectations for coal shipments to reflect the fire at the Aracoma mine.  On February 28, 2006, Massey Energy revealed to investors that the Company's

first quarter 2006 financial performance would not meet investor and analyst expectations due not only to the January fire at Aracoma, but also to weak longwall mining performance and Massey Energy's inability to hire and retain experienced labor.

83.     In March 2006 (in response to the Company's recent announcements), Third Point initiated a proxy contest seeking representation on the Board. On March 15, 2006, Third Point sent Massey Energy a notice (filed with the SEC on Form SC 13D on March 16, 2006) that it intended to nominate two directors, Daniel S. Loeb ("Loeb") and Todd Q. Swanson ("Swanson), at the Company's 2006 Annual Meeting to be held on May 16, 2006. The Form 13D filed by Third Point stated as follows:

> Third Point Offshore delivered its nominee notification because the Reporting Persons believe that the Company has not performed well and has lost sight of the concerns and interests of stockholders generally. The Reporting Persons believe that the Company's board of directors (the "Board") should include representatives of significant stockholders who can present stockholders' perspectives on management direction, champion reform of compensation, perquisites and managed incentives, and generally bring focus to the maximization of value for the benefit of stockholders. If elected to the Board, the Nominees will seek to accelerate execution of the Company's stock buyback program.

84.     Third Point filed an amended proxy statement with the SEC on March 20, 2006. The proxy statement set forth Third Point's reasoning behind launching a proxy contest and how the dissident slate of directors planned to increase shareholder value:

> Among the proposals that the Third Point Nominees expect to make are proposals to (i) accelerate and possibly expand the Company's share repurchase program; (ii) review the personal use by management of private aircraft, company housing and company cares; (iii) review the Company's need to own or lease private aircraft; and (iv) more closely tie management compensation to the Company's operating results. In regards to the last of these potential proposals, the Third Point Nominees believe, particularly in light of the fact that Company guidance as to the level of produced coal shipments has been revised downward three times in a recent span of less than six months, that it is necessary to hold management accountable for operational shortcomings.

85.     On April 24, 2006, Third Point filed another amended proxy statement on Form
DEFA14A soliciting shareholder support for its slate of directors.  This filing provided greater
detail regarding the obvious shortcomings in Blankenship's (and the other Individual
Defendants') stewardship of the Company and Blankenship's excessive compensation:

> *History of Poor Management Guidance and Weak Stock Performance*
>
> We have become increasingly concerned with Massey Energy's
> decreasing projected production levels and management's inability to
> make accurate forecasts.  The Company operates in an industry that is
> benefiting from increasing market demand and strong pricing, particularly
> in the Central Appalachia dynamics has not helped stockholders.
>
> Management recently lowered guidance three times in less than six
> months.  The second of these unwelcome surprises came on January 26th,
> following the tragic fire at the Aracoma Alma mine, when management
> reduced expected shipments "to conservatively reflect the impact" of the
> fire on production.   Yet only one month later, on February 28,
> management warned that first quarter performance was "far below"
> expectations "primarily due to the Aracoma fire, weak longwall
> performance and a shortfall in production form other underground mines,
> which continue to suffer from lack of experienced, available labor."
>
> *           *           *
>
> *Extravagant Compensation for Massey Energy's CEO*
>
> In the past three years, the Company has lavished compensation on its
> Chief Executive Officer, paying him a multiple of the CEO compensation
> paid by four publicly traded competitors – Peabody Energy Corporation,
> CONSOL Energy Inc., Arch Coal, Inc. and Foundation Coal Holdings,
> Inc.
>
> For the year ended December 31, 2005, Massey Energy's CEO was paid
> $33.7 million, more than four times the average compensation of $8.1
> million for the competitors' CEOs.
>
> For the three years ended December 31, 2005, Massey Energy's CEO
> received an average of $15.6 million per year, as compared with an
> average of $5.3 million per year paid to the competitors' CEOs.
>
> In 2004 and 2005, Massey Energy paid to its CEO 40.9% and 52.1%,
> respectively, of the entire "Adjusted Net Income" reported by the
> Company for those years.

\*      \*      \*

*Corporate Governance Issues*

Even in a larger corporation, sometimes it's the small things that set the tone. If elected to Massey Energy's Board of Directors, the Third Point Nominees intend to take a close look at management perquisites and related-party transactions, including the following:

<u>Massey Energy's Air Force</u>

The Company maintains among its fleet of aircraft a multi-million dollar Challenger 601 jet, with a range of some 3,000 miles that in the past year has been flown to Nassau, Bahamas; Las Vegas, Nevada; Scottsdale, Arizona; Bar Harbor, Maine; and numerous locations in Florida and California, including West Palm Beach, Naples, Los Angeles, San Diego and San Francisco. We find it troubling that Massey Energy maintains this luxury jet when a majority of its business is in Central Appalachia (an area extending no more than 500 miles), and our concern is heightened by Company disclosures indicating that Company aircraft are available, at Company expense, for the personal use of the CEO. If elected to the Board of Directors, we will urge the Board to get rid of the Challenger 601 luxury jet and review the use of the other aircraft. We think a good place to put the cost savings from the luxury jet would be a program to reward and retain the Company's miners.

<u>Dealings with Relatives</u>

Massey Energy purchases more that $1 million per year of automobile and light truck parts from A-A Tire and Parts, Inc. ("A-A"), a company owned by a nephew of the Company's CEO. While not disclosed in the Company's proxy statement, we understand that another relative of the CEO is an officer of A-A and that as many as five relatives of the CEO work for A-A. We believe that transactions such as these should be expressly approved by the Board's audit committee. The Company should promptly disclose to stockholders not only a detailed explanation of the reasons for any such approval, but also meaningful facts that indicate the significance of the Company's relationship to the executive's relative or his business. In the case of A-A, we believe that the Company should disclose what percentage of its revenues the Company's $1 million of expenditures represented.

<u>CEO Housing</u>

Massey Energy's CEO is provided a Company-owned home to live in. In fact, after he leaves the Company, the house is to be given to him as a parting gift. No one else at the Company gets free housing, much less an entire home as a retirement gift. What kind of example does it set when a

CEO who makes $33.7 million in a single year is given free housing while the Company is having difficulty retaining its mine workers?

86.     At the annual meeting on May 16, 2006, shareholders cast their votes in support of the Third Point director nominees, sending a clear message to Massey Energy's Board and management that they were unhappy with the status quo and the manner in which Defendant Blankenship had controlled and directed the Company's operations, as well as how he was compensated.  On June 28, 2006, the Third Point Directors, Loeb and Swanson, began serving on Massey Energy's Board.

87.     However, just days later, on June 30, 2006, Defendant Blankenship, with the approval of the other Director Defendants, caused Massey Energy to (a) amend its by-laws to expand the size of the Board, and (b) appoint Defendant Crawford, the former CEO of James River Coal Company, as a director.

88.     By expanding the size of the Board, Blankenship and his cronies effectively diluted the impact of outside shareholder representation on the Board.  Blankenship's action had the desired effect of thwarting substantive reform, as the Third Point directors resigned after serving on the Board for less than one year.

89.     On June 13, 2007, Loeb and Swanson resigned from Massey Energy's Board and very publicly stated their concerns about Massey Energy's management generally and Blankenship's leadership specifically.  A resignation letter signed by Loeb and Swanson (and filed with the SEC on June 14, 2007) stated in part:

> We believe that the sale of substantially all forward production, without locking in costs, reflects poor risk management.  As well, the Company's confrontational handling of environmental and regulatory matters has simply been counterproductive.  These and other correctible deficiencies combine to maintain a "Blankenship Discount" in the market price for Massey Energy's shares, and do a grave disservice to our shareholders by masking the underlying strength of the Company's business, asset and workforce.

90.     In response to the resignation of the two Third Point directors, and in an effort to solidify his control over the Company, on June 18, 2007, Blankenship caused the Massey Energy Board to approve an amendment to its by-laws to reduce the number of authorized board members from ten to eight. The Company's treatment of the Third Point directors is just a further illustration of Blankenship's domination of the Board.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

91.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

92.     Plaintiff is a shareholder of nominal defendant Massey Energy, was a shareholder of Massey Energy at the time of the wrongdoing alleged herein, and has been a shareholder of Massey Energy continuously since that time.

93.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

94.     At the time this action was originally commenced, the Board consisted of eight directors: Defendants Blankenship, Phillips, Moore, Gee, Gabrys, Crawford, Inman and Foglesong (the "Original Director Defendants"). In the intervening time, Defendants Judge and Suboleski have been appointed to the Board (the "New Director Defendants"). As a result of the facts set forth herein, Plaintiff has not made any demand on the Massey Energy Board to institute this action against the Individual Defendants. Such demand would be a futile and useless act because all of the Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action. As demonstrated herein, all of the Original Director Defendants failed to act in the face known duties. They consciously failed to comply with applicable laws and regulations, causing the Company to be subject to severe penalties and liability.

- 38 -

95.    The Original Director Defendants consciously failed to prevent or remedy the misconduct alleged herein, causing millions of dollars of losses to the Company in, *inter alia*, fines, penalties, and damages paid to tort claimants.

96.    The Original Director Defendants were presented with substantial "red flag" warnings that the Company was not in compliance with applicable federal and state statutes and regulations regarding environmental and worker safety.  These warnings included the following:

(a)    Easily verified, documented systematic noncompliance with NPDES permits by over 25 of it subsidiaries, reflected in the subsidiaries own records and notices of violation received from the State of West Virginia;

(b)    Notification of actions against and settlement of litigation related to various subsidiaries' environmental noncompliance by the West Virginia Department of Environmental Protection in 2006;

(c)    The October 2000 slurry spill in Martin County, Kentucky, which cost the Company millions of dollars to clean up and which the EPA has described as "the worst environmental disaster in the southeastern United States";

(d)    Two Massey Energy subsidiaries, Independence and Omar, pleading guilty to federal environmental crimes and receiving five years' probation and the maximum fine of $200,000 as part of a plea agreement with federal prosecutors in December of 2002 that required the Company to institute environmental compliance measures;

(e)    Other repeated and systematic notices of violation and enforcement actions by the state and federal agencies charged with ensuring compliance with laws and regulations to protect the environment and worker safety as summarized above;

(f)    Lawsuits by workers alleging that they have been wrongfully discharged for reporting safety violations, including the lawsuit by the safety monitor resulting from an October 6, 2005 termination that resulted in a $1 million punitive judgment against the Company on top of another $1 million in other damages;

(g)    The tragic deaths of two miners in the January 19, 2006 Aracoma Fire and the subsequent investigations, reports, lawsuits and fines – all of which was covered extensively by the national media;

(h)    The initiation of a criminal investigation into the Aracoma Fire in the Spring of 2006 and its coverage by the media;

  (i)  National media coverage as early as the Spring of 2006 of Blankenship's October 19, 2005, "running coal" memorandum to deep-mine supervisors and the implication of its connection with the January 19, 2006 Aracoma Fire;

  (j)  The handling of the request from MSHA for information and physical evidence by Massey Energy subsidiary and its counsel and the unprecedented lawsuit against the subsidiary by MSHA to compel the production of the needed information and evidence and the publicity generated thereby;

  (k)  The special report to the Governor of West Virginia from the West Virginia Office of Miners' Health Safety and Training and from MSHA regarding how violations of mandatory health and safety laws caused the Aracoma Fire;

  (l)  Receipt of a highly publicized $1.5 million fine for the Aracoma Fire as an Assistant U.S. Secretary of Labor for Mine Safety and Health announced that "[t]he number and severity of safety violations at the mine at the time of the fire demonstrated reckless disregard for safety, warranting the highest fine MSHA has levied for a fatal coalmining accident"; and

  (m)  The filing of the EPA Action.

97.  At a minimum, Original Director Defendants Gee, Crawford, Foglesong, Moore, Gabry, and Phillips, all of whom served on the SEPPC, were aware of these red flags and the chronic control deficiencies that existed at the Company during the relevant period.   The existence of systemic, egregious and material violations of environmental and worker-safety laws and regulations extending back through at least 2000, as cited herein, demonstrate that the Company either had no monitoring policies or procedures in place or that these defendants consciously ignored that such policies or procedures were ineffective.

98.  Moreover, all the Director Defendants, who are now undoubtedly aware of the "red flags" detailed above, have continued to permit the Company to operate in an unsafe manner in gross breach of their fiduciary duties even after the Settlement of the State Action. The death of Massey Energy employee James Woods and the fine and citation in connection with the death of Massey Energy employee Ricky Collins, Sr. are directly attributable to the

Director Defendants' failure to implement and maintain adequate internal controls. Accordingly, the Director Defendants are incapable of disinterestedly considering a demand to vigorously prosecute the Action because they face a substantial likelihood of liability for breaching their fiduciary duties.

99.     Furthermore the entire Board cannot independently and disinterestedly consider a demand to vigorously prosecute the claims alleged herein because in breach of their fiduciary duties the entire Board approved both the inadequate Notice of the Settlement of the State Action and the deficient Settlement itself, and as such face a substantial likelihood of liability for breaching their fiduciary duties to Massey Energy and its shareholders. Similarly the Director Defendants, and especially the members of the SEPPC, cannot independently and disinterestedly consider a demand to vigorously prosecute this Action because the Director Defendants face a substantial likelihood of liability for breaching their fiduciary duties by deliberately failing to comply with the terms of the Settlement.

100.    Additionally, Directors Crawford, Foglesong, Inman and Moore, as members of the Compensation Committee, cannot independently and disinterestedly consider a demand to vigorously prosecute the Action, because they face a substantial likelihood of liability for breaching their fiduciary duties in connection with their approval of Blankenship's excessive compensation.

101.    In addition, the directors of Massey Energy cannot be relied upon to reach a truly independent decision as to whether to commence the demanded actions against Blankenship (as well as certain of the Company's officers responsible for the misconduct alleged in this complaint) because, *inter alia*, the Board is dominated by Blankenship, as demonstrated, in part, by the Board's approval of his excessive compensation and the Board's unwavering

acquiescence to Blankenship's wishes. Blankenship was, and continues to be, personally and directly involved in the misconduct alleged herein, and the Board has consistently acceded to his directives to the detriment of the Company. This domination of the Board by Defendant Blankenship has impaired the Board's ability to validly exercise its business judgment and renders it incapable of reaching an independent decision as to whether to institute litigation in this instance.

102. Defendant Blankenship, who is the singularly most powerful person at the Company, personally directed Massey Energy's environmental and worker protection practices. Blankenship is the Chairman of the Board, chairman of the Company's Executive Committee, and the Company's CEO, and, as such, is in a position to and does exercise control over the Company and all aspects of its business, including the activities of the Board. The Board's unyielding loyalty to Defendant Blankenship is amply demonstrated by the contents of the letter of resignation written by former Massey Energy directors Loeb and Swanson. That June 13, 2007 letter to Blankenship stated, in relevant part, that *"[t]he Board clearly shared our view as to the attractiveness and importance of such a transaction, but its misguided insistence on keeping you in place as CEO outweighed strategic considerations and prevented the consummation of a deal that would have been in the best interest of all shareholders."*

103. That the Company's Board has an unyielding loyalty to Defendant Blankenship (and that the Individual Defendants have consciously and/or recklessly fostered, through systematic inaction, a corporate culture evidencing a willful disregard for applicable legal obligations) is manifested by a 2006 proxy contest that (a) resulted in the election of two new directors and (b) ended with the subsequent resignation of those same directors less than one

year later due to the gamesmanship of Blankenship in controlling the rest of the Board and manipulating its very composition.

104.    Blankenship's control and domination of the Board is further illustrated by his family members' commercial ties to Massey Energy.  Blankenship's brother, George Blankenship, is a certified public accountant who, since 1977, has performed accounting services for several of Massey Energy's vendors and independent contractors.  Defendant Blankenship's nephew, Keith Blankenship, owns A-A, from which Massey Energy and several of its subsidiaries purchase automobile and light truck parts.  During the year ended December 31, 2006, the Company's subsidiaries expended an aggregate of $1,096,754 for goods and services provided by A-A.

105.    Additionally, the following directors, due to employment and other personal relationships and financial interests, are incapable of impartially considering a derivative demand.

**Phillips**

106.    Phillips reports to Blankenship, and Blankenship is in a position to control Phillips' future financial opportunities.  Phillips' principal professional occupation and means of earning a living is his employment with Massey Energy.  Defendant Phillips earned over $2.41 million during 2007, over $2.13 million during 2006 and over $1.58 million during 2005. Moreover, on November 10, 2008, Phillips was promoted to President of Massey Energy, which was accompanied by a new three-year employment agreement.  The terms of Phillips' new employment agreement are substantial and include: (i) a minimum base salary of $650,000, subject to increase by the Board of Directors, as its deems appropriate; (ii) an annual cash bonus award with a target amount equal to no less than 60%, 70% and 80% of his base salary for the Company's 2009, 2010 and 2011 fiscal years, respectively; (iii) a one-time award of 18,000

shares of restricted stock, 11,340 restricted units and 75,000 non–qualified stock options, vesting in equal installments over three (3) years; (iv) an annual retention cash award of $200,000 to be paid on each of July 31, 2009, July 31, 2010, and July 31, 2011, provided Mr. Phillips remains continuously employed by the Company through each of the respective payment dates; and (v) life insurance, D&O insurance, medical and other standard benefits and perquisites provided to senior executives from time to time. As a result of his employment Phillips has received and will continue to receive valuable financial benefits, which would be lost if Blankenship and his cronies decided to terminate Phillips' employment. Thus, Phillips cannot objectively and independently evaluate a demand to commence this Action.

**Moore**

107.   Defendant Moore is the Chairman of Moore Group, Inc. a multi-franchise auto dealership holding company. As disclosed in the Company's latest definitive proxy statement, several of Massey Energy's subsidiaries purchase vehicles and services from subsidiaries of Moore Group, Inc. Indeed, during the year ended December 31, 2006, the company expended an aggregate of $241,296 for vehicles and services provided by subsidiaries of Moore Group, Inc.

108.   Moore was appointed to the Board by Defendant Blankenship and is beholden to him. In 2004, Moore ran for Governor of West Virginia. According to the West Virginia People's Election Coalition, Moore received a total of $57,087.00 in his 2004 election campaign. Of that, Massey Energy Company donated $17,750.00. Jarosinski, Adkins, Short, Gee, Blankenship and Inman also donated to Moore's 2004 election campaign.

**Suboleski**

109.   Formerly Defendant Suboleski worked directly under Defendant Blankenship when he served as Executive Vice President and Interim Chief Operating Officer of Massey Energy from 2001 to 2003. Defendant Suboleski left Massey pursuant to his appointment as a

Commissioner on the Federal Mine Safety and Health Review Commission. During his tenure as a Commissioner, Defendant Suboleski made several rulings favorable to Massey Energy's subsidiaries that call into question his independence from Blankenship and the Company, including re-opening numerous default judgments for penalty assessments against Massey Energy subsidiaries Elk Run Coal Company, Marfork Coal Company, Independence Coal Company, Highland Mining Company and Sydney Coal Company.

110.   Demand is also excused because the Director Defendants' conduct was so egregious on its face that it could not have been the product of sound business judgment. To the contrary, the wrongdoing and harm alleged in this Complaint flow directly from the Director Defendants' deliberate and conscious decision to follow Blankenship's mandate to "run coal" at the expense of legal and regulatory requirements and worker safety, which was a complete abdication of the Director Defendants' fiduciary duties.

### COUNT I

#### Against the Individual Defendants for Breach of Fiduciary Duty
#### in Connection with the Company's Safety and Environmental Violations

111.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

112.   As detailed herein, the Individual Defendants abdicated their responsibility to establish and maintain adequate safety and environmental controls at Massey Energy, having made no good faith effort to fulfill their fiduciary duties. The Individual Defendants did nothing about problems they knew existed at Massey Energy and its subsidiaries. Rather, they instituted and maintained a corporate culture that encouraged unlawful and irresponsible activity in the name of increased and continued production.

113. As alleged in detail herein, the Individual Defendants consciously engaged in a sustained and systemic failure to properly exercise their fiduciary duties.

114. Following the Settlement of the State Action, the Individual Defendants, with full knowledge of the "red flags" cited herein, continued to breach their fiduciary duties by continuing to abdicate their responsibility to establish and maintain adequate safety controls at the Company, which resulted in the death of at least one Massey Energy employee and a fine and citation for the death of another Massey Energy employee.

115. As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, Massey Energy has sustained damages, including, but not limited to, fines, penalties, and damages paid to tort claimants, as alleged herein.

## COUNT II

### Against the Director Defendants for Breach of Fiduciary Duty in Connection with Approval of the State Action Settlement and Notice

116. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

117. As alleged in detail herein, the Director Defendants' approval of the deficient Notice was a breach of their fiduciary duty of candor.

118. Furthermore, the Director Defendants breached their fiduciary duties of loyalty and good faith by approving the Settlement, which was intended solely to protect Blankenship and the other Individual Defendants (including the Director Defendants themselves) from liability for the massive damages they caused Massey Energy, not to promote the best interests of the Company and its shareholders.

119. As a direct and proximate result of the Director Defendants' foregoing breaches of their fiduciary duties, Massey Energy has has sustained damages, as alleged herein.

- 46 -

## COUNT III

### Against the Original Director Defendants for Breach of Fiduciary Duty in Connection with the Approval of Defendant Blankenship's Excessive Compensation

120.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

121.    The Original Director Defendants breached their fiduciary duties of loyalty and good faith by approving Defendant Blankenship's excessive compensation in light of the massive fines and penalties that have been levied against the Company as a direct result of his leadership.

122.    As a direct and proximate result of the Original Director Defendants' foregoing breaches of their fiduciary duties, Massey Energy has sustained damages, including, but not limited to, the excessive compensation paid to Blankenship.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.    Awarding against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.    Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties;

C.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

D.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

- 47 -

DATED:                        Respectfully submitted,

                              HILL WILLIAMS, PLLC


                              By:
                                  Barry Hill
                                  80 12th Street
                                  Wheeling, WV  26003
                                  Telephone:  304-233-4966
                                  Facsimile:  304-233-4969


                                        and

                              BARROWAY TOPAZ KESSLER
                              MELTZER & CHECK, LLP
                                  Lee D. Rudy
                                  Eric L. Zagar
                                  Robin Winchester
                                  Michael J. Hynes
                                  J. Daniel Albert
                                  280 King of Prussia Road
                                  Radnor, PA 19087
                                  Telephone: (610) 667-7706
                                  Facsimile: (610) 667-7056

                              Attorneys for Plaintiff

## VERIFICATION

I, Vernon Mercier, hereby verify that I have authorized the filing of the attached Amended Shareholder Derivative Complaint, that I have reviewed the Amended Shareholder Derivative Complaint, and that the facts therein are true and correct to the best of my knowledge, information and belief. I declare under penalty of perjury that the foregoing is true and correct.

DATE: 12-4-08

VERNON MERCIER