IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

VERNON MERCIER, derivatively on
behalf of MASSEY ENERGY COMPANY,

      Plaintiff,

v.                                      CIVIL ACTION NO. 2:07-0555

DON L. BLANKENSHIP, BAXTER
PHILLIPS, JR., DAN MOORE,
E. GORDON GEE, RICHARD M. GABRYS,
JAMES CRAWFORD, BOBBY R. INMAN,
ROBERT H. FOGLESONG, H. DREXEL
SHORT, JR., J. CHRISTOPHER ADKINS,
JEFFREY M. JAROSINSKI, LADY
BARBARA THOMAS JUDGE, STANLEY C.
SUBOLESKI, ELIZABETH CHAMBERLIN,
and THOMAS COOK,

      Defendants,

and

MASSEY ENERGY COMPANY, a Delaware
corporation,

      Nominal Defendant.

## MEMORANDUM OPINION AND ORDER

     Pending before the court are the Joint Motion to Dismiss of defendants Dan R. Moore, E. Gordon Gee, Richard M. Gabrys, James B. Crawford, Bobby R. Inman, Robert H. Foglesong, Lady Barbara Thomas Judge, Stanley C. Suboleski, and nominal defendant Massey Energy Company, (Doc. No. 96), and the Motion to Dismiss of defendants Don L. Blankenship, Baxter Phillips, Jr., H. Drexel Short, Jr., J. Christopher Adkins, Jeffrey M. Jarosinski,

Elizabeth Chamberlin, and Thomas Cook (Doc. No. 98).[1]  For the reasons set forth below, the court grants both motions.

## I.  Factual and Procedural Background

Plaintiff Vernon Mercier is a shareholder of nominal defendant Massey Energy Company ("Massey"), on whose behalf he filed a Shareholder Derivative Complaint in this court on September 7, 2007 ("original Complaint").  (Doc. No. 1.)  On July 22, 2008, as a result of a settlement reached in a parallel action then pending in the Circuit Court of Kanawha County, West Virginia, the undersigned held this matter in abeyance and denied the then-pending motions to dismiss without prejudice to refile. (Doc. No. 71.)  On June 25, 2008, a final settlement hearing was held in the state action, Manville Personal Injury Trust v. Blankenship, No. 07-C-1333 (Cir. Ct. Kanawha Co.)(the "Manville litigation"), as a result of which the Honorable Irene C. Berger of the Circuit Court of Kanawha County (the "Kanawha Court") entered a June 30, 2008, Agreed Order and Final Judgment approving the proposed settlement (the "Manville Settlement") and

_____

[1] After plaintiff filed his Amended Complaint on December 5, 2008, defendants first filed motions to dismiss on January 16, 2009.  (Doc. Nos. 77, 79.)  By Order entered February 24, 2009, however, Magistrate Judge Mary E. Stanley entered a revised briefing schedule pursuant to which the parties were to resubmit these motions and accompanying memoranda and exhibits, omitting certain exhibits and arguments which the parties agreed should be withdrawn.  (Doc. No. 95.)  As such, the court now **DENIES** the defendants' original motions to dismiss the Amended Complaint (Doc. Nos. 77, 79) as **MOOT.**

preserving the objections thereto of Mr. Mercier.  (See id.)
Upon agreement of the parties, this action was held in abeyance
pending either Mercier's appeal of the state court's order
approving the Manville Settlement, or the expiration of the four-
month period in which he could have petitioned for appeal.  (Id.)

By letter dated October 30, 2008, plaintiff's attorney
informed the court that Mr. Mercier had chosen not to pursue an
appeal of the state court's Agreed Order and Final Judgment.
(Doc. No. 72.)  Thereafter, Mercier filed an Amended Complaint in
this court on December 5, 2008, adding two claims not asserted in
his original Complaint, which had closely mirrored that in the
Manville litigation.[2]  (Doc. No. 76.)  In his Amended Complaint,
plaintiff alleges that the Manville Settlement has no preclusive
effect on this action "because of the constitutionally deficient
notice employed by defendants in the State Action."  (Doc. No. 76
at 2.)

As alleged by plaintiff, defendants in this action include
Don L. Blankenship, who has been a director of Massey since 1996
and Massey's Chief Executive Officer and Chairman of the Board
since 2000; Baxter Phillips, Jr., who has been a director since
2007 and president since November 10, 2008, after previously
serving in other executive positions; Daniel R. Moore, a director

---

[2]  Mercier invokes the court's diversity jurisdiction
pursuant to 28 U.S.C. § 1332.  (Doc. No. 76 at 2-3.)

-3-

since 2002, and also a member of the Compensation Committee and the Safety, Environmental and Public Policy Committee ("SEPPC"), among others; E. Gordon Gee, a director since 2000 and also a member of the SEPPC and other committees; Richard M. Gabrys, who has been a director since May 22, 2007, and also serves as a member of the SEPPC, among other committees; James Crawford, a director since 2005, and a member of the SEPPC and Compensation Committee, among other committees; Bobby R. Inman, who has been a director of Massey or its predecessor since 1985, and is a member of the Compensation Committee; and Robert H. Foglesong, who has been a director since 2006, and serves on both the Compensation Committee and the SEPPC.  (Id. at 3-5.)  Defendants also include H. Drexel Short, Massey's Senior Vice President of Group Operations from 1995 to 2007; John C. Adkins, Massey's Senior Vice President and Chief Operating Officer since 2003; Jeffrey M. Jarosinski, Massey's Vice President of Finance since 1998 and Chief Compliance Officer since 2002, as well as Chief Financial Officer from 1998 through 2002; Lady Barbara Thomas Judge, who has been a director since Feburary 19, 2008, and is a member of the SEPPC; Stanley C. Suboleski, also a member of the SEPPC, who has been a director since May 13, 2008, and formerly Massey's Executive Vice President and Interim Chief Operating Officer from 2001 to 2003; Elizabeth Chamberlin, Massey's Vice President of Safety and Training; and Thomas Cook, the company's Director of

-4-

Environmental Affairs since at least January 2007.  (Id. at 5-7.)
For purposes of the Amended Complaint, plaintiff has designated
Blankenship, Phillips, Moore, Gee, Gabrys, Crawford, Inman,
Foglesong, Judge, and Suboleski as the "Director Defendants."
Blankenship, Phillips, Moore, Gee, Gabrys, Crawford, Inman,
Foglesong, Short, Adkins, Jarosinski, Judge, Suboleski,
Chamberlin, and Cook are designated as the "Individual
Defendants."  (Id. at 7.)

Mercier alleges that the Individual Defendants have, since
2000, "consciously refused to exercise their fiduciary duties to
oversee the affairs of the Company and its subsidiaries."  (Id.
at 10.)  He contends that Blankenship concerns himself only with
producing coal, to the exclusion of the best interests of Massey
and the safety and health of its workers.  (Id.)  Mercier lists
violations of environmental laws and regulations committed by
Massey since 2000:

- Two Massey subsidiaries pleaded guilty in December 2002 to
  violating the Clean Water Act of 1977 ("CWA").  (Id. at 11.)

- Massey admitted in its Discharge Monitoring Reports to the
  State of West Virginia and the Commonwealth of Kentucky that
  it and its subsidiaries violated the CWA approximately 4,100
  times.  (Id.)

- State inspectors in West Virginia documented an additional
  147 violations of the National Pollutant Discharge

Elimination System ("NPDES") in 2006.  (<u>Id.</u> at 12.)

- As late as September 2007, discharges of pollutants by Massey subsidiaries continued to violate the CWA, despite the subsidiaries' April 2006 settlement of related lawsuits with the West Virginia Department of Environmental Protection.  (<u>Id.</u>)

- Massey subsidiaries were responsible for coal slurry spills in October 2000, August 2001, April 2002, July 2002, and October 2002.  (<u>Id.</u>)

- The Environmental Protection Agency ("EPA") filed suit against Massey in this court on May 10, 2007, alleging a large number of environmental compliance violations.  On January 18, 2008, the company announced a settlement of the suit pursuant to which it would implement a number of reforms and pay $20 million – the largest civil penalty in the EPA's history levied against a company for wastewater discharge permit violations.  (<u>Id.</u> at 13.)

Plaintiff also alleges infractions on the part of Massey with respect to worker safety laws and regulations:

- Massey received two "unwarrantable failure" and "high negligence" violations of federal mine standards from the United States Department of Labor Mine Safety and Health Administration ("MSHA") as a result of the October 2000 coal slurry spill, and four MSHA violations relating to the

-6-

February 2001 death of a miner.  The company was also found liable for improperly terminating two employees who reported safety violations.  (Id. at 14.)

- An October 2005 memorandum from Blankenship directing all deep-mine superintendents to "run coal" rather than performing any other work ("i.e. – build overcasts, do construction projects, or whatever") is cited as evidence of Massey's disregard for worker health and safety.  (Id.)

- A January 19, 2006, fire at the Aracoma Alma #1 mine, a Massey subsidiary mine, caused the death of miners Don Bragg and Ellery Hatfield.  As a result, a criminal investigation was commenced and the miners' widows filed a wrongful death lawsuit against Massey, its subsidiary, and Blankenship. The Massey subsidiary was also fined $1.5 million by MSHA in connection with the fire and cited by the West Virginia Office of Miner's Health, Safety and Training.  (Id. at 15-16.)

- A June 15, 2007, letter from MSHA to two Massey subsidiaries alleges a combined total of 330 violations for the period beginning January 2005.  (Id. at 17.)

Mercier goes on to recount a 2002 shareholder derivative action filed against Massey in the Circuit Court of Boone County, West Virginia, relating to violations of labor and environmental laws (the "Arlia litigation").  (Id.)  A 2005 settlement of the

litigation (the "Arlia Settlement") required Massey to implement several corporate governance reforms.  (Id. at 18-19.)

Plaintiff proceeds to describe the Manville Litigation, which was instituted in June 2007, only a few months before Mercier filed the instant action.  (Id. at 19.)  On May 20, 2008, the parties to the Manville Litigation entered into a proposed settlement, which they submitted – along with a proposed form of notice – to the Kanawha Court.  Both were preliminarily approved, the June 25, 2008, settlement hearing was scheduled, and the Manville Notice was published in the Wall Street Journal on May 23, 2008.[3]  (Id. at 19-20.)  Mr. Mercier contends that the Manville Notice wrongfully failed to include information about the claims being settled, the identity of the defendants, attorney phone numbers through which to obtain additional information, or a means by which to view a copy of the Settlement.  (Id. at 22-23.)  He further takes issue with the amount of time allotted to shareholders in which to object to the Settlement.  (Id.)

The Director Defendants' approval of the Manville Notice is alleged to be a breach of their fiduciary duty of candor to shareholders.  (Id. at 23.)  Additionally, Mercier asserts that the Manville Settlement, itself, constitutes a breach of the

_____

[3]  The Manville Notice is set forth in full in the Amended Complaint at pages 20-22.

directors' fiduciary duties, as it calls "only for corporate therapeutic relief on the part of Massey" to resolve claims of worker safety and environmental violations, and because it was entered into "solely to protect Blankenship and the other Individual Defendants (including the Director Defendants themselves) from liability."  (Id. at 23-24.)  Plaintiff also alleges that the Director Defendants have further breached their fiduciary duties by failing to comply with the terms of the Manville Settlement since entering into it.  (Id. at 24-28.)

Mercier then relates two incidents which he contends evince the Individual Defendants' continued breach of their fiduciary duties since entering into the Manville Settlement.  He states that, on or about September 19, 2008, Massey employee James O. Woods was injured in an accident, suffering serious spinal injuries from which he later died – an incident classified by MSHA as a coal mining fatality.  (Id. at 28-29.)  The second matter Mercier notes is the October 26, 2008, citation and $2,250 fine of Massey by the United States Occupational Safety and Health Administration ("OSHA") for an incident involving the death of Massey employee Ricky Collins, Sr.  (Id. at 29.)

Plaintiff next takes up the issue of defendant Blankenship's compensation, which he contends is excessive.  He notes that, over the preceding three years, Blankenship received more than $44.5 million, 283,333 stock options, and 150,000 stock

appreciation rights ("SARs"), "far outpacing the compensation paid to the CEOs of most of the companies in Massey Energy's self-defined peer group (the "Comparator Group") as delineated in Massey Energy's 2008 Proxy Statement."[4]  (Id. at 29-30.) Blankenship's compensation, he notes, has been nearly double the average compensation of his peers in the self-defined Comparator Group, without including the value of other perks Blankenship receives, such as housing arrangements and access to corporate jets for personal use.  (Id. at 30-31.)  In a November 2007 agreement, Massey extended Blankenship's employment through December 31, 2009, under terms set forth in detail in the Amended Complaint.  (Id. at 31-32.)  This agreement also provided for the transfer to Blankenship of title to a company-owned residence and property in Sprigg, West Virginia.  (Id. at 32.)

Mercier observes that the above compensation was approved by the Compensation Committee on which defendants Crawford, Foglesong, Inman, and Moore sat, and alleges that Blankenship "dominates" the Compensation Committee "through his position as Chairman of the Board and his personal connections" with the committee's members.  (Id.)  These defendants are thus alleged to have breached their fiduciary duties of loyalty and good faith. (Id. at 33.)

---

[4]  At page 30 of the Amended Complaint, plaintiff lists the companies comprising the Comparator Group, along with the compensation received by each company's CEO.

The Amended Complaint next sets forth details of a proxy battle waged by Third Point LLC ("Third Point"), which as of September 2005 owned 5.9% of Massey common stock on the open market.  (Id.)  Third Point took the position that Blankenship should be removed as CEO, as his poor management had negatively affected Massey's stock price and returns to shareholders.  (Id.) In the spring of 2006, Third Point nominated two directors, Daniel S. Loeb and Todd Q. Swanson, explaining that it took this action due to concerns about Blankenship's compensation and his stewardship of the company.  (Id. at 34-37.)  After a vote in their favor at the annual meeting on May 16, 2006, Loeb and Swanson began serving on the company's board on June 28, 2006. (Id. at 37.)

Mercier alleges that two days later, Blankenship, "with the approval of the other Director Defendants, caused Massey Energy to (a) amend its by-laws to expand the size of the Board, and (b) appoint Defendant Crawford, the former CEO of James River Coal Company, as a director."  (Id.)  "By expanding the size of the Board," plaintiff continues, "Blankenship and his cronies effectively diluted the impact of outside shareholder representation on the Board."  (Id.)  Loeb and Swanson resigned after serving one year on the board, making public their concerns about Blankenship and the rest of Massey's leadership.  (Id.)  As evidence of Blankenship's domination of the board, plaintiff

avers that, immediately thereafter, Blankenship "caused the
Massey Energy Board to approve an amendment to its by-laws to
reduce the number of authorized board members from ten to eight."
(Id. at 38.)

At the time plaintiff originally filed suit, the board was
composed of eight directors: Blankenship, Phillips, Moore, Gee,
Gabrys, Crawford, Inman, and Foglesong (the "original Director
Defendants").  (Id.)  At the time the Amended Complaint was
filed, defendants Judge and Suboleski had joined the board (the
"new Director Defendants").  (Id.)  Mercier alleges that demand
of these defendants under Federal Rule of Civil Procedure 23.1
would have been futile, as "all of the Director Defendants are
incapable of making an independent and disinterested decision to
institute and vigorously prosecute this action."[5]  (Id.)

---

[5]  That rule provides in pertinent part as follows with
respect to derivative actions:

(a) Prerequisites.  This rule applies when one or more
shareholders or members of a corporation or an unincorporated
association bring a derivative action to enforce a right that
the corporation or association may properly assert but has
failed to enforce.  The derivative action may not be
maintained if it appears that the plaintiff does not fairly
and adequately represent the interests of shareholders or
members who are similarly situated in enforcing the right of
the corporation or association.

(b) Pleading Requirements.  The complaint must be verified
and must:
. . .
(3) state with particularity:
(A) any effort by the plaintiff to obtain the desired
action from the directors or comparable authority and, if

Plaintiff contends that the original Director Defendants were presented with and failed to act upon numerous substantial "red flags" that Massey was in violation of safety and environmental laws and regulations.[6]  He further contends that

---

necessary, from the shareholders or members; and
(B) the reasons for not obtaining the action or not making the effort.
. . .

Fed. R. Civ. P. 23.1.

[6]  Mercier lists the following "red flag" warnings in the Amended Complaint:

(a)  Easily verified, documented systematic noncompliance with NPDES permits by over 25 of it[s] subsidiaries, reflected in the subsidiaries['] own records and notices of violation received from the State of West Virginia;

(b)  Notification of actions against and settlement of litigation related to various subsidiaries' environmental noncompliance by the West Virginia Department of Environmental Protection in 2006;

(c)  The October 2000 slurry spill in Martin County, Kentucky, which cost the Company millions of dollars to clean up and which the EPA has described as "the worst environmental disaster in the southeastern United States";

(d)  Two Massey Energy subsidiaries, Independence and Omar, pleading guilty to federal environmental crimes and receiving five years' probation and the maximum fine of $200,000 as part of a plea agreement with federal prosecutors in December of 2002 that required the Company to institute environmental compliance measures;

(e)  Other repeated and systematic notices of violation and enforcement actions by the state and federal agencies charged with ensuring compliance with laws and regulations to protect the environment and worker safety as summarized above;

(f)  Lawsuits by workers alleging that they have been wrongfully discharged for reporting safety violations, including the lawsuit by the safety monitor resulting

-13-

defendants Gee, Crawford, Foglesong, Moore, Gabrys, and Phillips, as members of the SEPPC, were aware of these red flags, which allegedly demonstrate that Massey "either had no monitoring policies or procedures in place or that these defendants

---

  from an October 6, 2005 termination that resulted in a $1 million punitive judgment against the Company on top of another $1 million in other damages;

(g) The tragic deaths of two miners in the January 19, 2006 Aracoma Fire and the subsequent investigations, reports, lawsuits and fines – all of which was covered extensively by the national media;

(h) The initiation of a criminal investigation into the Aracoma Fire in the Spring of 2006 and its coverage by the media;

(i) National media coverage as early as the Spring of 2006 of Blankenship's October 19, 2005, "running coal" memorandum to deep-mine supervisors and the implication of its connection with the January 19, 2006 Aracoma Fire;

(j) The handling of the request from MSHA for information and physical evidence by Massey Energy subsidiary and its counsel and the unprecedented lawsuit against the subsidiary by MSHA to compel the production of the needed information and evidence and the publicity generated thereby;

(k) The special report to the Governor of West Virginia from the West Virginia Office of Miners' Health Safety and Training and from MSHA regarding how violations of mandatory health and safety laws caused the Aracoma Fire;

(l) Receipt of a highly publicized $1.5 million fine for the Aracoma Fire as an Assistant U.S. Secretary of Labor for Mine Safety and Health announced that "[t]he number and severity of safety violations at the mine at the time of the fire demonstrated reckless disregard for safety, warranting the highest fine MSHA has levied for a fatal coalmining accident"; and

(m) The filing of the EPA Action.

(Doc. No. 76 at 39-40.)

consciously ignored that such policies or procedures were ineffective." (Id. at 40.)

Mercier alleges that the Director Defendants face a substantial likelihood of liability for breaching their fiduciary duties by continuing to permit the company to operate in an unsafe manner, as evidenced by the death of James Woods and the fine and citation relating to the death of Ricky Collins, Sr. (Id. at 40-41.)  He asserts that the entire board is incapable of independently and disinterestedly considering a demand to prosecute his claims because all board members face a substantial likelihood of liability for the fiduciary breaches occasioned by their approval of the Manville Notice and Settlement.  (Id. at 41.)  Plaintiff asserts that Crawford, Foglesong, Inman, and Moore, who serve on the Compensation Committee, cannot act independently and disinterestedly, as they face a substantial likelihood of liability for breaching their fiduciary duties by approving Blankenship's compensation.  (Id.)

Further, plaintiff cites the board's approval of Blankenship's compensation and its "unwavering acquiescence to Blankenship's wishes" in alleging that the directors are dominated by Blankenship and cannot act independently for purposes of demand under Rule 23.1.  (Id. at 41-42.)  Plaintiff contends that Blankenship's domination is further evidenced by the 2006 proxy battle initiated by Third Point, and by the June

-15-

2007 resignation letter of Loeb and Swanson, in which the ex-directors assert that the board was compelled to forego an attractive transaction that would have been in the best interest of shareholders due to "its misguided insistence on keeping [Blankenship] in place as CEO . . . ." (Id. at 42-43.)  Mercier also cites commercial ties between two of Blankenship's family members and the company in support of his contention that Blankenship exercised control and domination over the board. (Id. at 43.)

With regard to defendant Phillips, plaintiff makes particularized allegations regarding Phillips' compensation for his employment with Massey, concluding that such valuable financial benefits render Phillips incapable of objectively and independently evaluating a demand in this action.  (Id. at 43-44.)

With respect to defendant Moore, Mercier notes the purchase by Massey subsidiaries of vehicles and services from Moore Group, Inc., an auto dealership holding company of which defendant Moore is chairman.  (Id. at 44.)  In 2006, these expenditures amounted to $241,296.  (Id.)  Mercier also observes that, in connection with his 2004 campaign for Governor of West Virginia, Moore received financial contributions from Jarosinski, Adkins, Short, Gee, Blankenship, and Inman, as well as $17,750 from Massey. (Id.)

Finally, Mercier alleges a lack of independence on the part of defendant Suboleski as evidenced by his conduct after leaving the company.  Upon his appointment as Commissioner of the Federal Mine Safety and Health Review Commission, Suboleski allegedly "made several rulings favorable to Massey Energy's subsidiaries that call into question his independence from Blankenship and the Company, including re-opening numerous default judgments for penalty assessments against Massey Energy subsidiaries . . . ."  (Id. at 45.)

In Count One of the Amended Complaint, Mercier alleges a claim against the Individual Defendants for breach of their fiduciary duty in connection with Massey's safety and environmental violations.  (Id.)  Mercier alleges that the Individual Defendants instituted and maintained a corporate culture which "encouraged unlawful and irresponsible activity in the name of increased and continued production," abdicating their responsibility to maintain adequate safety and environmental controls at the company.  (Id.)  He alleges that the Individual Defendants did so despite the "red flags" listed above, resulting in "the death of at least one Massey Energy employee and a fine and citation for the death of another Massey Energy employee."  (Id. at 46.)  These breaches of fiduciary duties on the part of the Individual Defendants are alleged to have been the proximate cause of damages sustained by Massey,

-17-

including fines, penalties, and damages paid to tort claimants. (Id.)

Count Two of the Amended Complaint asserts that the Director Defendants breached their fiduciary duties in approving the Manville Notice and Settlement. (Id.) Mercier states simply that these defendants' approval of the "deficient" Manville Notice amounted to a breach of their fiduciary duty of candor. He proceeds to allege that, because the Manville Settlement was "intended to protect Blankenship and the other Individual Defendants (including the Director Defendants themselves) from liability," approval of the Settlement constituted a breach of the directors' duties of loyalty and good faith. (Id.)

Finally, Count Three asserts that the Director Defendants breached their fiduciary duties in approving Blankenship's compensation. (Id. at 47.) Mercier claims that, "in light of the massive fines and penalties that have been levied against the Company as a direct result of [Blankenship's] leadership, this conduct amounted to a breach of the directors' duties of loyalty and good faith. (Id.)

## II.  **Analysis**

### A.  **Effect of Prior Litigation**

The court will first address defendants' argument that Counts One and Three are, at least partially, precluded by the settlement of the state action. Defendants base these arguments

on the Manville Settlement of May 20, 2008, which included a broad release, and contend that – to the extent plaintiff relies on conduct occurring before execution of the settlement – his claims must fail.  (Doc. No. 102 at 6.)

Under the Manville Settlement, the parties to the state action agreed to the full release of

> all claims . . . or causes of action, that have been or could have been asserted by Plaintiff derivatively on behalf of Massey or by Massey against Defendants or Related Persons in the Litigation, or any of them, that are based upon the facts, transactions, events, occurrences, acts, statements, omissions or failures to act that were or could have been alleged in the [Manville] Litigation through May 20, 2008 [excluding the right to enforcement of the Settlement terms].[7]

(Doc. No. 97 Ex. C at ¶ 1.9.)  Pursuant to the state court's Agreed Order and Final Judgment, all Massey shareholders are to be bound by the settlement.  (Doc. No. 96 Ex. B at 3.)  The Arlia Settlement included a similar broad release.  (Doc. No. 100 Exs. H, I.)  Defendants observe that both the Arlia and Manville suits involved claims for breach of fiduciary duty relating to

---

[7] "Defendants" in the Manville Litigation were Massey as a nominal defendant, Don L. Blankenship, Baxter Phillips, Jr., Dan Moore, Gordon Gee, Richard M. Gabrys, James Crawford, Bobby R. Inman, Robert Foglesong, H. Drexel Short, Jr., J. Christopher Adkins, Jeffrey M. Jarosinski, James L. Gardner, John C. Baldwin, Martha R. Seger, and James H. Harless.  (Doc. No. 97 Ex. C at ¶¶ 1.1, 1.4.)  "Related Persons" included "all past and present directors, officers, agents, servants, employees, affiliates, insurers, accountants, auditors and attorneys for nominal defendant Massey and their counsel."  (Id. at ¶ 1.8.)  The language of the release thus applies to all defendants in the instant action.

-19-

violations of environmental and safety laws, as Mercier asserts in Count One.  (Doc. No. 100 Ex. G at ¶¶ 3-4, 24-26, 68-118, 121, 124-25; Doc. No. 97 Ex. D at ¶¶ 1-10, 34-38, 43-44, 49-101, 143-46.)  Moreover, allegations akin to those set forth in Count Three relating to Blankenship's compensation were also made in both the Arlia and Manville actions.  (Doc. No. 100 Ex. G at ¶¶ 48-50; Doc. No. 97 Ex. D at ¶¶ 122, 130.)

Plaintiff's chief argument in opposition to giving effect to the prior releases is that defendants have failed to abide by the terms of the Manville Settlement, and thus may not enjoy the benefit of its release.  (Doc. No. 106 at 17.)  Defendants maintain that they have complied with the terms of the settlement, and that, regardless of their compliance, the breaches Mercier alleges are not material.  (Doc. No. 109 at 20.)

In the state court's June 30, 2008, Agreed Order and Final Judgment, the Manville court included the following jurisdictional reservation: "Without affecting the finality of this Judgment in any way, this Court hereby retains continuing jurisdiction over: (a) implementation and enforcement of the terms of the Settlement and this Judgment; and (b) the Settling Parties for the purposes of implementing and enforcing the Stipulation and Judgment."  (Doc. No. 96 Ex. B at ¶ 12.)  Such provisions are often found in court settlement orders, and are widely enforced.  See Kokkonen v. Guardian Life Ins. Co., 511

-20-

U.S. 375, 381 (1994)(explaining that "the court's 'retention of jurisdiction' over the settlement . . . may, in the court's discretion, be one of the terms set forth in the order").  See also Ruskay v. Waddell, 552 F.2d 392, 394 n.4 (2d Cir. 1977)(noting that general releases of this type are commonly granted in the settlement of derivative suits).  As a preliminary matter, therefore, the court notes that it is wary of treading on matters properly reserved by another court for that court's review, such as whether the parties to a settlement approved by that court have complied with the terms of their agreement.

Of equal concern is the procedural posture of plaintiff's action.  Mercier's Amended Complaint avers that his collateral attack of the Manville Settlement in this court is permissible because the Manville Notice failed to comply with the requirements of federal Due Process.  (Doc. No. 76 at ¶ 3.) Citing Epstein v. MCA, Inc., 179 F.3d 641, 645 (9th Cir. 1999), Mercier argues that this court is not required to accord full faith and credit to what he maintains is a "constitutionally infirm judgment."  Id. (quoting Kremer v. Chemical Construction Corp., 456 U.S. 461, 482 (1982)).

This line of authority, however, does not aid plaintiff's case.  The collateral review discussed in Epstein – which plaintiff acknowledges is limited – looks to the procedures employed in the prior litigation to determine whether they

-21-

"afforded the party against whom the earlier judgment is asserted a 'full and fair opportunity' to litigate the claim or issue." Epstein, 179 F.3d at 648-49 (quoting Kremer, 456 U.S. at 480). Only if there is "'reason to doubt the quality, extensiveness, or fairness of the *procedures* followed in the prior litigation'" does the court's obligation to give full faith and credit to the prior judgment become an issue.  Epstein, 179 F.3d at 648 (quoting Kremer, 456 U.S. at 481).

Mercier is in an awkward position to criticize the procedures employed by the court in the prior litigation, as he did not avail himself of them.  Although he appeared at the final settlement hearing held by the Kanawha Court on June 25, 2008, and lodged objections to both the Manville Settlement and Notice – objections which were preserved by that court in its June 30, 2008, order – he did not attempt to appeal the Kanawha Court's order.  He contends that his reason for not pursuing an appeal was the "dearth of pertinent case law concerning what constitutes adequate notice under West Virginia Rule of Civil Procedure 23.1."[8]  (Doc. No. 106 at 16.)  Of course, had he sought direct

_____

[8]  Plaintiff further explains his failure to pursue a direct appeal to the Supreme Court of Appeals of West Virginia by asserting that the Kanawha Court "[found] that *this* Court was the appropriate forum to examine both whether the notice complied with federal due process and how the approval of the Manville Settlement would impact this Action."  (Doc. No. 106 at 16 (emphasis in original).)  The Kanawha Court made no such finding, however, instead declaring, "With respect to your motion regarding federal court litigation, *I make no finding whatsoever*.

review of the Kanawha Court's order, he would have afforded the
Supreme Court of Appeals of West Virginia an opportunity to speak
to the requirements of the rule.

In the context of a trial court's approval of a settlement
involving a minor, the West Virginia Supreme Court has explained
that

> [a] judgment on the merits, fairly rendered, by a court
> of competent jurisdiction, having cognizance both of the
> parties and the subject matter, however erroneous it may
> be, is conclusive on the parties and their privies until
> reversed or set aside in a direct proceeding for that
> purpose and is not amenable to collateral attack.

Hustead v. Ashland Oil, 475 S.E.2d 55, 60 (W. Va. 1996)(quoting
Storm v. Nationwide Mut. Ins. Co., 97 S.E.2d 759 (Va. 1957)).
The court proceeded, "'The indulgence of a contrary view would
result in creating elements of uncertainty and confusion and in
undermining the conclusive character of judgments, consequences
which it was the very purpose of the doctrine of res judicata to
avert.'"   Id. (quoting Federated Dep't Stores, Inc. v. Moitie,
452 U.S. 394, 398-99 (1981)).  Accordingly, Mercier's attack on
the finality of the Manville Settlement and Notice must fail.

---

I'll leave any finding as to the effect of this on federal
litigation up to the judge who is presiding over your federal
case." (Doc. No. 101 Ex. K at 67:15-20.)  See In re Philadelphia
Stock Exchange, Inc., 945 A.2d 1123, at *1147 (Del. 2008)(quoting
Matsushita Elec. Indus. Co., Ltd. v. Epstein, 516 U.S. 367, 396
(1996))("'A court conducting an action cannot predetermine the
res judicata effect of the judgment; that effect can be tested
only in a subsequent action[;] i.e., by the federal courts where
those actions are pending.'").

**B.    Futility of Demand**[9]

In order to preserve the managerial freedom of corporate directors, Rule 23.1 requires that a shareholder invoking the mechanism of a derivative action plead with particularity either the efforts he has made to obtain the desired relief from the directors, or his reasons for not doing so.  He must plead sufficient facts to establish reasonable doubt either that (1) the directors are disinterested and independent, or (2) the transaction he challenges was otherwise the product of a valid exercise of business judgment.  Aronson v. Lewis, 473 A.2d 805, 814 (Del. 1984).  Where the directors are being challenged for their failure to act, the shareholder must plead sufficient facts to establish reasonable doubt that the board could have properly exercised its independent and disinterested business judgment in responding to a demand as of the time the shareholder filed his complaint.  Rales v. Blasband, 634 A.2d 927, 934 (Del. 1993).

It is the plaintiff's burden in a derivative action to overcome the key principle of this area of jurisprudence, which is that the directors are entitled to a presumption that they were faithful to their fiduciary duties.  Beam v. Stewart, 845

---

[9]  For purposes of determining whether Mercier has complied with the requirements of Federal Rule of Civil Procedure 23.1 in filing this action, pleading standards are dictated by federal law.  Grill v. Hoblitzell, 771 F. Supp. 709, 711 n.2 (D. Md. 1991).  Substantive requirements, however, are governed by the state of incorporation – in this case, Delaware.  Id.

A.2d 1040, 1048-49 (Del. 2004)(citing <u>Aronson</u>, 473 A.2d at 812, for the proposition that "'[i]t is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'").  As such, a plaintiff must make his showing with respect to at least half the members of the board.[10]   <u>Aronson</u>, 473 A.2d at 814-15.

To establish that a director is "interested," a plaintiff must show that he stands to gain or lose personally and materially from the board's decision.  "[T]he mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors."  <u>Id.</u> at 815.  A shareholder plaintiff must show a substantial likelihood that the director will be held liable, and only in rare cases will a transaction "be so egregious on its face that board approval cannot meet the test of business judgment."  <u>Id.</u>

With regard to director independence, the court's primary consideration is whether a given director's decision is based "on the corporate merits of the subject before the board, rather than

---

[10]   The parties agree that, for purposes of Counts One and Three, the directors relevant to the court's inquiry are Blankenship, Phillips, Moore, Gee, Gabrys, Crawford, Inman, and Foglesong.  With respect to Count Two, the court must also consider the independence and disinterestedness of defendants Judge and Suboleski.  <u>See</u> <u>Braddock v. Zimmerman</u>, 906 A.2d 776, 785, 779 (Del. 2006).

extraneous considerations or influences." <u>Beam</u>, 845 A.2d at 1049.  To show lack of independence, a plaintiff must demonstrate that the board is either dominated by an officer or director who is the proponent of the challenged transaction, or that the board is so under that director's influence that its discretion is sterilized.  <u>Levine v. Smith</u>, 591 A.2d 194, 205 (Del. 1991).

## 1.   Risk of Liability

Turning to the issue of whether the directors face a substantial likelihood of liability on the claims Mercier asserts, the court concludes that plaintiff has failed to create reasonable doubt as to the disinterest of a majority of the board.  With respect to Count One, which alleges that the directors wrongly failed to act, plaintiff must show that the directors "'face a substantial likelihood of liability' that renders them 'personally interested in the outcome of the decision on whether to pursue the claims asserted in the complaint.'"  <u>Stone v. Ritter</u>, 911 A.2d 362, 367 (Del. 2006)(citing <u>Rales</u>, 634 A.2d at 934).  Count One requires a showing either that "the directors utterly failed to implement any reporting or information system or controls," or that, having implemented such a system or controls, the directors "consciously failed to monitor or oversee its operations."  <u>Stone</u>, 911 A.2d at 370.

It is thus a heavy burden that plaintiff faces, as "'only a sustained or systematic failure of the board to exercise oversight – such as an utter failure to attempt to assure a reasonable information and reporting system exists – will establish the lack of good faith that is a necessary condition to liability.'"  Id. at 372 (quoting In re Caremark Int'l Inc. Deriv. Litig., 698 A.2d 959, 971 (Del. Ch. 1996)).  Moreover, because allegations of conduct occurring prior to May 20, 2008, are released under the Manville Settlement, plaintiff may rely only on his allegations of conduct occurring after that date: the September 19, 2008, injury of Massey employee James O. Woods, and the October 26, 2008, citation and $2,250 OSHA fine for an incident involving the death of Massey employee Ricky Collins, Sr. – an incident which actually occurred in March 2008.  These allegations do not amount to the type of failure described in Stone, and are insufficient to state a claim to relief that is facially plausible.  See Lainer v. Norfolk S. Corp., No. 06-1986, 2007 U.S. App. LEXIS 28253, at *3 (4th Cir. Dec. 5, 2007) (quoting Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007)).

Under Count Two, plaintiff alleges that the defendants breached their duties of candor, good faith, and loyalty by approving the Manville Settlement and Notice.  The duty of candor is implicated where directors seek shareholder action, and it

requires that they "disclose fully and fairly all material information within the board's control" in such cases.  Stroud v. Grace, 606 A.2d 75, 84 (Del. 1992).  The approval of the settlement and notice did not necessitate shareholder action, however, so the duty of candor is not implicated.  Because settlement agreements almost universally release directors, officers, and other agents from liability, and are thus generally not treated as interested party transactions, defendants do not face a substantial risk of liability for breaches of the duties of good faith and loyalty.  H-M Wexford LLC v. Encorp. Inc., 832 A.2d 129, 149-50 (Del. Ch. 2003).

Finally, as set forth above, plaintiff's allegations in Count Three relating to Blankenship's compensation are subject to release under the Manville Settlement.  Mercier therefore fails to establish a substantial likelihood of liability as to any of the Amended Complaint's three counts.

## 2.    Independence

Plaintiff makes particularized allegations regarding the independence of only Blankenship, Phillips, Moore, and – with respect to Count Two – Suboleski.  Because he has not made particularized allegations as to the independence of at least half the board, he must demonstrate that the board was either dominated by Blankenship or so under his influence as to sterilize its discretion.  Levine, 591 A.2d at 205.  Mercier has

failed to make this showing.  A plaintiff "must allege specific facts detailing why board members lacked independence or were beholden . . . with respect to the challenged transaction."  In re Trump Hotels Shareholder Derivative Litig., Nos. 96 Civ. 7820 (DAB), 96 Civ. 8527 (DAB), 2000 U.S. Dist. LEXIS 13550, at *23-24 (S.D.N.Y. Sept. 21, 2000).  Mercier's conclusory allegations regarding Blankenship's dominance and influence are thus insufficient in the absence of allegations as to why he was able to exercise domination over the board.  See In re InfoUSA, Inc. Shareholders Litig., 953 A.2d 963, 972 (Del. Ch. 2007).

### 3.   Valid Business Judgment

Finally, the court turns to the second prong of the Aronson test.  A plaintiff challenging a transaction's validity as a business judgment must carry the heavy burden of raising a reason to doubt that the transaction was taken honestly and in good faith, or by raising a reason to doubt that the board was adequately informed when it made its decision.  In re J.P. Morgan Chase & Co. Shareholder Litig., 906 A.2d 808, 824 (Del. Ch. 2005)(citing In re Walt Disney Co. Derivative Litig., 825 A.2d 275, 286 (Del. Ch. 2003)).  Plaintiff must do so by pleading particularized facts.  Id.

With regard to Count Two, the court observes that plaintiff has made no allegations that the directors faced a substantial risk of liability in the Manville Litigation, thus rendering them

interested in the approval of the settlement; nor has he made particularized allegations that the board failed to inform itself adequately before approving the settlement.  The board's rational business purpose of settling the claims against it is thus protected by the business judgment rule.  See H-M Wexford, 832 A.2d at 150.

In Count Three, plaintiff contends that the directors' approval of Blankenship's compensation amounted to an invalid business judgment such that the directors breached their fiduciary duties to the company and its shareholders.  While the court acknowledges that Blankenship's pay and other benefits are, by any standard, remarkably generous, Delaware law dictates that "the size and structure of executive compensation are inherently matters of judgment."  Brehm v. Eisner, 746 A.2d 244, 265 (Del. 2000)(internal citation omitted).

> In the absence of facts casting a legitimate shadow over the exercise of business judgment reflected in compensation decisions, a court, acting responsibly, ought not to subject a corporation to the risk, expense, and delay of derivative litigation, simply because a shareholder asserts, even sincerely, the belief and judgment that the corporation wasted corporate funds by paying far too much.

Gagliardi v. Trifoods Int'l, Inc., 683 A.2d 1049, 1051 (Del. Ch. 1996).

### III.   Conclusion

To the extent his allegations are not precluded by the Manville Settlement, Mercier has failed to satisfy the <u>Aronson</u> and <u>Rales</u> tests.  Plaintiff has not raised a reasonable doubt as to the disinterestedness or independence of a majority of the board; nor has he demonstrated that the decisions he questions are invalid business judgments.  Defendants having persuaded the court that plaintiff has failed to demonstrate futility of demand, the court hereby **GRANTS** the defendants' motions to dismiss the amended complaint (Doc. Nos. 96, 98) and **DENIES** their previously filed motions to dismiss (Doc. Nos. 77, 79) as **MOOT**.

Further, the court **GRANTS** plaintiff's motion to exceed the page limit for his omnibus memorandum in opposition to the motions to dismiss (Doc. No. 105) and defendants' joint motion to exceed the page limit for their reply memorandum (Doc. No. 108). The court withholds issuance of its Judgment Order pending its resolution of defendants' motion for sanctions under Federal Rule of Civil Procedure 11.  (Doc. No. 103.)

The Clerk is directed to send copies of this Memorandum Opinion and Order to all counsel of record.

It is **SO ORDERED** this 30th day of September, 2009.

ENTER:

David A. Faber
Senior United States District Judge

-31-